**Marion TERWILLIGER and Doris Terwilliger, Plaintiffs–Appellees,**

v.

**GREYHOUND LINES, INC., a foreign corporation, and James Shelby, jointly and severally, Defendants–Appellants,**

**M.J. Jorgensen, Defendant.**

**No. 87–1236.**

United States Court of Appeals, Sixth Circuit.

Argued March 3, 1988.

Decided Aug. 10, 1989.

Rehearing and Rehearing En Banc Denied Sept. 26, 1989.

Ronald G. Acho (argued), Cummings, McClorey, Davis, and Acho, P.C., Livonia, Mich., for defendants-appellants.

Donald R. Day, Phoenix, Ariz., for Greyhound Lines.

J. Douglas Peters, Charfoos, Christensen & Archer, David R. Parker (argued), Detroit, Mich., for plaintiffs-appellees.

Before ENGEL, Chief Judge [*]; MERRITT and KRUPANSKY, Circuit Judges.

ENGEL, Chief Judge.

Defendant Greyhound Lines, Inc. ("Greyhound") appeals the judgment of the district court awarding plaintiff Marion Terwilliger damages following a jury determination that Greyhound committed fraud and misrepresentation under Michigan law against Terwilliger by denying Terwilliger's application for reemployment in 1971. For the reasons stated below, we find that Terwilliger's state-law claim is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and hold that this case should have been dismissed for Terwilliger's failure to exhaust the remedies available in the collective bargaining agreement.

## I.

Marion Terwilliger was first employed as a bus driver by Greyhound in 1943 and was a member of the local chapter of the Amalgamated Transit Union ("Union") throughout his employment. In 1966, after Terwilliger experienced heart problems, his doctor disqualified him from employment as a bus driver with Greyhound. Pursuant to his rights under the collective bargaining agreement between Greyhound and the Union, Terwilliger was then granted disability pension status. In 1970, Terwilliger passed the Department of Transportation physical and began driving buses for a local carrier, and in 1971, he reapplied to Greyhound for

[*] The Honorable Albert J. Engel assumed the duties of Chief Judge April 1, 1988.

employment. His application included a recommendation of fitness for employment from his personal physician.

Pursuant to the collective bargaining agreement, Greyhound referred Terwilliger to an independent physician, Dr. Herman Kantor, for a second examination. Dr. Kantor's report did not recommend him for reemployment. The report listed two reasons for the recommendation: Terwilliger's vision was below standard and a Department of Transportation code number relating to heart disease. After Greyhound asked Dr. Kantor to clarify his findings, Kantor sent a letter and a second examination report which stated that Terwilliger's vision was below standard, but that his heart condition met the Department of Transportation standards, though possibly not Greyhound's internal standards.[1] Greyhound then denied Terwilliger's petition for reemployment. Terwilliger wrote a letter to the Union challenging Greyhound's denial of his reinstatement.

Based only on the letter from Terwilliger's physician and Dr. Kantor's initial report,[2] the Union was faced with disagreeing physicians regarding Terwilliger's heart condition. Article 12 of the Collective Bargaining Agreement provides for this situation:

Employees failing to pass medical examinations by competent medical authority approved by the Company may be disqualified for service. This disqualified employee or the Union may, within ten (10) days after such examination make written request to the Company for further examination by the employee and the other by the Company.... In the event of disagreement between the two physicians, a representative of the Company and a representative of the Union shall meet within ten (10) days from the date of written notice of disagreement between the physicians, to select a third physician. The third physician shall make an examination and the findings of a majority of three shall rule.

Following this procedure, the Union and Greyhound decided upon a third physician, Dr. Breneman, a cardiologist. Dr. Breneman determined that Terwilliger should not be reemployed by Greyhound due to his heart condition. Based on this report, Greyhound confirmed its denial of Terwilliger's reapplication for employment in 1971.

The Union advised Terwilliger that it could do nothing more for him and in 1973 he hired a lawyer to sue Greyhound. In 1980, Terwilliger learned that his attorney had not yet filed suit, and Terwilliger's separate malpractice action against the lawyer was settled for $225,000 in 1985.[3] In 1981, Terwilliger again sought reinstatement with Greyhound. Greyhound denied his request because he refused to provide updated medical reports on his condition. Terwilliger remained on disability status until 1983, when he reached his normal retirement age.

In the course of Terwilliger's malpractice action against his lawyer in 1984, Terwilliger first gained access to the second examination report by Dr. Kantor. In July, 1985, he discovered an internal Greyhound memo[4] which he claims is evidence that

---

1. The collective bargaining agreement does not limit Greyhound's right to enact stricter medical standards for its drivers than those adopted by the Department of Transportation.

2. Dr. Kantor's letter and the second examination report were not given to Terwilliger or the Union, though no express explanation for this omission appears in the record. Therefore, in 1971 the Union only had access to the first report by Dr. Kantor.

3. The record reveals that Terwilliger had agreed with his lawyer to delay bringing suit in order to increase the potential damages. In so doing, the attorney negligently let the time period for bringing suit lapse. This negligence by the at-

torney was the basis for Terwilliger's malpractice action which ended in a settlement for Terwilliger of $225,000.

4. The memo, written for Greyhound's internal files by one of their dispatchers states:

J. Junglas telephoned and advised to call Mayberry Grand Clinic, Doctor Kantor, and have him forward another physical on M.D. Terwilliger. Disqualification on vision below standard not accepted by company. Have the following inserted under Reason for not approving:
"In our opinion this man does not meet the DOT requirements as set out in part 391.41(b)(4) covering heart involvement."
I telephoned Mr. Jorgensen and related the above information to him. I advised him that

Greyhound fraudulently withheld the second examination report in order to deny his reinstatement. Terwilliger claims that discovery of this memo in 1985 first led him to believe that Dr. Kantor had recommended nonreinstatement based on Terwilliger's vision alone and that there did exist a second report.

In August 1985, Terwilliger filed the present suit seeking back pay and other damages, alleging state-law claims for breach of contract, negligence, and fraud and misrepresentation through Greyhound's denial of his reinstatement in 1971. Terwilliger claimed that Greyhound employees intentionally changed the first report by Dr. Kantor and concealed the second report in order to secure the Union's agreement to an examination by a third physician, all as part of a Greyhound plot to not rehire Terwilliger as a driver. At trial, with only the fraud and misrepresentation claim remaining, the jury returned a verdict for Terwilliger, awarding him $250,000 in actual damages and $500,000 in consequential damages. Pursuant to pretrial agreement, this was set-off by the $225,000 from Terwilliger's previous attorney malpractice award, resulting in a total award of $525,000. Greyhound appeals.

## II.

Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides:

Suits for violation of contracts between an employer and a labor organization representing employees ... may be brought in any district court of the United States having jurisdiction of the parties ....

The Supreme Court has determined that section 301 not only confers federal jurisdiction over controversies involving collective bargaining agreements, but also authorizes the federal courts to fashion a body of federal law for the enforcement of section 301. *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957). In *Teamsters v. Lucas Flour,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Court determined that the federal law preempts local law so that a uniform body of labor law can be developed to avoid conflicts in the interpretation of collective bargaining agreements. Then, in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985), the Court determined that the preemptive effect of the federal labor law extended to state-law tort claims which are "inextricably intertwined with consideration of the terms of the labor contract" as well as pure contract claims. In 1987, the Court summarized the preemption doctrine as follows: "Section 301 governs claims founded directly on rights created by collective bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987).

Mr. Terwilliger had signed the original physical form, and what about another physical form without Mr. Terwilliger's signature on it should the Union request to see the physical form. He advised to have the Company Doctor state on the corrected physical form the following:

"We neglected to state the patient's heart condition, therefore, it is necessary to issue a corrected physical form".

Mr. Jorgensen further advised to have the following clarified:

On physical form under THORAX: *Heart Normal to A & P*

Mr. Jorgensen advised the above should be clarified on the physical form.

I called Doctor Kantor and was advised he is on vacation until August 23rd, and spoke to Mr. Wayne Morche. He took the information related to us by the Safety Dept. He further advised that everything pertaining to Mr. Terwilliger's heart was normal, and A & P meant the heart beat is normal, and he did not know what they could put on the physical form under "Heart" that would disqualify him. I referred him to statement made by Lincoln Clinic for reason of Terwilliger's Disqualification and asked if he received a copy of it if it would assist him in determining the terminology to use; he advised it might. I told him I would have to obtain approval from Mr. Jorgensen.

Mr. Jorgensen advised to send copy of physical to clinic.

I advised Mr. Morche to have Doctor Kantor submit a corrected physical upon his return from vacation 8–23–71. Mr. Morche stated since he spoke with me earlier, he had located a copy of the physical form dated 8–2–66, but did not have a copy of the Supplementary Report dated 8–2–66, I advised him a copy would be forwarded.

In 1988, the Supreme Court clarified the scope of the terms "substantially dependent on analysis of a collective bargaining agreement" and "inextricably intertwined" in a tort context in *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). *Lingle* involved a claim of retaliatory discharge for filing a worker's compensation claim. The Court held that the claim was not preempted because "resolution of the state-law claim [did] not require construing the collective-bargaining agreement." *Id.* 108 S.Ct. at 1882. The Court noted that the two elements of retaliatory discharge, that the employee was discharged or threatened with discharge, and that the employer's motive was to deter him from exercising his rights under the Worker's Compensation Act, were purely factual and did not involve interpretation of the terms of the agreement. *Id.*

On the basis of *Lingle*, this court has recently reconsidered a claim of tortious interference with a contract by a third party and found no preemption of that state-law claim because the claim could be resolved without interpreting the collective bargaining agreement. *Dougherty v. Parsec*, 872 F.2d 766 (6th Cir.1989). *Dougherty* involved a claim against a non-signatory to a collective bargaining agreement who was not bound by the terms of the contract and thus not bound to the arbitration process for resolution of disputes. The court recognized that a major policy underlying the preemption principle was "that permitting state law claims would allow plaintiffs to avoid the fundamental labor policy that contract disputes should be decided by arbitrators in the first instance." *Id.* at 771. Because the defendant was a third party to the contract and the relationship of the parties was not defined by the contract, there was no basis for preemption because a dispute between them would not have been subject to arbitration initially. Thus the court determined that preemption principles did not apply.

This court, en banc, also recently considered the issue of preemption under section 301 in *Smolarek v. Chrysler Corp.*, 879 F.2d 1326 (6th Cir.1989). *Smolarek* involved two types of claims: a claim of retaliatory discharge for filing a workmen's compensation claim and a claim under the Michigan Handicapper's Civil Rights Act. The court, en banc, determined that neither of the two claims was subject to section 301 preemption: first, because resolution of the claims did not require interpreting the terms of the collective bargaining agreement in force, and second, because the rights that the employee sought to vindicate were created by state law and did not arise solely under the terms of the collective bargaining agreement. At 1331.

■ Thus, in evaluating Terwilliger's claim, we must determine first, whether resolution of Terwilliger's state-law claim of fraud and misrepresentation requires interpretation of the terms of the collective bargaining agreement such that this claim should have been decided by arbitration pursuant to the terms of the agreement in the first instance and second, whether his claim is based on rights created by the collective bargaining agreement or under state law. Here, Terwilliger has pleaded his cause of action as one based upon fraud by the employer in carrying out the process of examining a reinstatement request by a medically disqualified employee and misrepresentation regarding Terwilliger's physical condition when it negotiated with the Union for an examination by a third physician. Terwilliger attempted to frame his claim purely in state-law fraud terms. However, such "artful pleading" will not suffice to avoid preemption under section 301. *See Hyles v. Mensing*, 849 F.2d 1213 (9th Cir.1988) ("Plaintiffs may not avoid removal by 'artfully pleading' their claims to omit references to preemptive federal law."). Terwilliger essentially has alleged that Greyhound, acting in bad faith, violated the provisions of the collective bargaining agreement.

Terwilliger in essence claims that Greyhound failed to abide by the terms of the agreement when it negotiated with the Union for an examination by a third physician. Resolution of this claim requires interpretation of the terms of the agreement in order

to determine whether, in fact, Greyhound complied with them when it negotiated for the third physician.[5] To hold otherwise would allow plaintiffs to avoid the obligation of arbitration by "artfully pleading" their claims and would, in our view, eviscerate the strong policy favoring arbitration which has been a cornerstone of federal labor law since the *Steelworkers Trilogy.*[6] Therefore because resolution of this claim does require a construction of the terms of the collective bargaining agreement, Terwilliger's claim is preempted by section 301.[7]

The rights which Terwilliger seeks to vindicate arise solely under the terms of the collective bargaining agreement. The agreement creates the right to re-employment claimed by Terwilliger and provides the only basis for the relationship between Terwilliger and Greyhound. "Section 301 governs claims founded directly on rights created by collective-bargaining agreements...." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987). Since both the relationship between the parties and the process for reinstatement were governed by the collective bargaining agreement, the claim must be preempted by section 301[8] if the important policies underlying the *Steel-*

*workers Trilogy* are to be accorded more than mere lip service.

Preemption in this case, then, is more essential here as a matter of public policy since *both* triggers of section 301 preemption are present: resolution of the state-law claim directly requires construction of the terms of the agreement itself, and the rights sought to be vindicated and the relationship between the parties are created not by state law, but by the collective bargaining agreement itself.

■ Since this claim is preempted by section 301, it should have been first resolved through the grievance procedures established by the collective bargaining agreement.

As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by the employer and union as the mode of redress. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965) (footnote omitted) (emphasis in original). "[A]n employee [can]not sidestep the grievance machinery provided in the contract and ... unless he attempt[s] to utilize the contractual procedures for settling his dispute with his employer, his independent

---

**5.** The third physician selected by representatives of management and the union found Terwilliger's heart condition to be disabling:

It is my opinion that this gentleman does have significant coronary artery disease. For this reason he should not be employed in the operation of a commercial or passenger transport vehicle.

**6.** *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**7.** Even assuming that the second physical report was intentionally withheld, that report and Dr. Kantor's letter do not conclusively foreclose the application of Article 12 of the collective bargaining agreement pertaining to disagreeing physicians. The letter did not indicate that Terwilliger's heart condition enabled him to drive for Greyhound, but that his condition might not

meet Greyhound's internal standards. Therefore, there still existed a situation involving disagreeing physicians' resolution of the disagreement would involve the terms of the agreement. Further, any analysis involving Greyhound's internal standards is itself uniquely a contractual question which should have been resolved in the first instance by the arbitration process specified in the agreement.

The question whether the company's physician finally concluded that Terwilliger was, or was not disabled—purely factual, though impaired obviously by company attempts to influence him—would in our view be the kind of decision entrusted to the arbitrator based upon the equivocal nature of his reports.

**8.** Interestingly, although relying primarily upon whether the terms of the contract would be interpreted during resolution of the state claim, in both *Lingle* and *Smolarek* the wage earner was suing to vindicate rights expressly conferred by state statute for the benefit of persons in his class and entirely separate from rights conferred by the contract.

suit against the employer in the District Court [will] be dismissed." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976). It is undisputed that Terwilliger did not exhaust the remedies available to him either with the Union or pursuant to the collective bargaining agreement. "A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, ... as well as eviscerate a central tenet of federal-labor contract law that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Allis–Chalmers*, 471 U.S. at 220, 105 S.Ct. at 1915. Therefore, this case should have been dismissed by the district court for failure to exhaust available remedies.

Terwilliger claims that he is excused from exhausting the available remedies either because pursuing such remedies in this instance would have been futile or because Greyhound repudiated the contract and its dispute resolution procedures. The record does not support either of these contentions.

## A. Futility

■ Terwilliger first claims that pursuing the remedies set forth in the collective bargaining agreement would have been futile. Certainly, viewed in a light most favorable to plaintiff, his employer, whether genuinely fearing his heart was not up to the stress of his job, or implied baser motives, pursued a course of action to achieve its objectives which is at least unethical, if not downright dishonest. This circumstance does not, however, lead inexorably to the conclusion that arbitration, if pursued, would have been futile.

"[T]he exhaustion requirement is subject to a number of exceptions [where] doctrinaire application of the exhaustion rule would defeat the overall purposes of federal labor relations policy." *Glover v. St. Louis–San Francisco Railway*, 393 U.S.

324, 329–30, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969). One such exception occurs "where the effort to proceed formally with contractual or administrative remedies would be wholly futile." *Id.* at 330, 89 S.Ct. at 551. The Sixth Circuit requires "a clear and positive showing of futility before excusing a failure to exhaust...." *Miller v. Chrysler Corporation*, 748 F.2d 323, 326 (6th Cir.1984) (quoting *Winter v. International Brotherhood of Teamsters, Local 639*, 569 F.2d 146, 149 (D.C.Cir. 1977)). Terwilliger has made no such showing. That he subjectively may have thought such procedures were futile is insufficient. Even assuming the validity of his allegations that Greyhound engaged in fraud or deceit regarding the reinstatement process, this does not indicate that the company would not have cooperated with the dispute resolution process and does not constitute a clear and positive showing of futility. Such an assertion is similar to that made in *Miller, supra,* wherein the employees failed to initiate grievance procedures with the union because they believed that the union was in agreement with the company and would not have pursued their claim. Such a subjective belief was insufficient to excuse them from at least *attempting* to utilize the procedures. Here, Terwilliger admits that he did not attempt to pursue his available remedies under the collective bargaining agreement.[9] Therefore, he has no basis to claim that such procedures would have been futile.

## B. Repudiation

■ Exhaustion may also be excused "when the conduct of the employer amounts to a repudiation of [the] contractual procedures." *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). Although repudiation of the contractual procedures is an excuse for exhaustion, such repudiation must be of the grievance procedures themselves. *See Anderson v. Ideal Basic Industries*, 804

---

9. Indeed, had Terwilliger initiated the grievance procedures contemplated in the collective bargaining agreement, the second report and the letter as well as the internal memo may have come to light during the arbitration process and could have been resolved by the arbitrator if they affected his claim to reinstatement.

F.2d 950 (6th Cir.1986) (where employees filed grievance only two weeks prior to filing suit, company's failure to process it in the short time available did not constitute repudiation); *United Slate, Tile and Composition Roofers v. G & M Roofing and Sheet Metal Co.,* 732 F.2d 495 (6th Cir.1984) (an outright refusal to comply with grievance procedures would constitute repudiation); *Geddes v. Chrysler Corp.,* 608 F.2d 261, 263 (6th Cir.1979) ("Employers are normally estopped from seeking dismissal of a claim based on failure to exhaust remedies when they have taken the position that those remedies are not available to the employees."). Terwilliger asserts that Greyhound repudiated the contract when it fraudulently withheld the second physical examination report and misrepresented Terwilliger's physical condition in order to secure Union agreement to a third physician's examination. However, Terwilliger has not asserted that Greyhound ever refused to abide by the terms of the contract regarding the available grievance procedures. In fact, Terwilliger never even filed a formal grievance on this matter, thus depriving Greyhound any opportunity to resolve the claim through the procedures found in the collective bargaining agreement. We therefore find no evidence of repudiation by Greyhound which excuses Terwilliger's failure to exhaust the remedies available to him under the collective bargaining agreement.[10]

### III.

The national policy encouraging a uniform body of labor law, *Textile Workers v. Lincoln Mills,* 353 U.S. at 451, 77 S.Ct. at 915, and encouraging arbitration as the strongly preferred means by which disputes involving collective bargaining agreements ought to be resolved, *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), requires that the federal labor principles and the methods for dispute resolution provided by collective bargaining

agreements should and must take precedence. We do not read the recent case law, such as *Lingle,* to imply anything less. Because Terwilliger's claim involves interpretation of the collective bargaining agreement and rights created solely by the agreement, Terwilliger's claim is preempted by section 301 of the Labor Management Relations Act and the relief to which he might be entitled is governed thereby. Before a section 301 action can be initiated, an employee must attempt to use the procedures available under the collective bargaining agreement. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Terwilliger never attempted to invoke the procedures available to him. It follows, therefore, that his claim should have been dismissed by the district court for failure to exhaust the remedies available under the collective bargaining agreement, there being no evidence of futility of initiating the procedures nor evidence that Greyhound repudiated the contract regarding the grievance procedures.

We think that after viewing this court's decisions in *Smolarek* and *Dougherty,* as contrasted to the circumstances here, that this decision provides a reasonable and workable interpretation of the Supreme Court's intent as expressed in *Allis–Chalmers* and *Lingle,* and substantially relieves any tension which might otherwise exist in this area.

For the foregoing reasons, the judgment of the district court is REVERSED, and the case is REMANDED with directions that it be DISMISSED for failure to exhaust available remedies.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I agree with the Court that this dispute cannot be resolved without interpreting the collective bargaining agreement. I further agree with the Court that the grievance process is not *now* futile as the plaintiff has actually discovered the alleged fraud.

---

10. Having determined that Terwilliger's claim is preempted by section 301 and should have been dismissed for failure to exhaust available remedies, we do not examine defendant's other contentions regarding statute of limitations, insufficiency of the evidence or the alleged errors by the trial court.

We should not, however, simply dismiss this case without having provided plaintiff an opportunity to pursue his claims. The plaintiff is still entitled to pursue in the grievance process the wrongs which he has alleged his employer committed.

This is a difficult and puzzling case because of the jury's finding that the employer, Greyhound, defrauded the plaintiff employee in the reinstatement and grievance process by manufacturing false medical reports and misrepresenting the diagnosis of the company's doctor. That conduct so misled the plaintiff; his counsel and his union representative that a fair grievance process became improbable during the period of fraudulent nondisclosure.

Once, however, the evidence of the employer's fraudulent misconduct became apparent at a later date, a full and fair grievance process became possible. That grievance process, not a lawsuit in state or federal court, was what the parties had bargained for. At this point in the history of this case, however, we encounter the problem of the limitations period for initiating the grievance process, for Greyhound prevented plaintiff from discovering its fraud until the limitations period had expired. It would be inequitable to allow Greyhound, on these facts, to escape the grievance procedure it has contracted for. Rather, the employer's concealment of the real facts and the pendency of this lawsuit toll the running of the limitations period for the filing of a grievance proceeding. Hence the grievance process remains open even at this late date. The case should be remanded to the District Court with instructions to order the parties to proceed with the grievance process provided by the collective bargaining agreement. The arbitrator will be in a position to construe the terms of the collective bargaining agreement in light of the alleged fraudulent concealment of medical information and determine the appropriate award, if any.