RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ADAMO DEMOLITION COMPANY, d/b/a Adamo Group,
Inc. and Adamo Group,

     *Plaintiff-Appellant,*

  *v.*

INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL 150, AFL-CIO; JAMES M. SWEENEY,

     *Defendants-Appellees.*

┐
│
│
│
│   No. 20-1163
│
│
│
│
┘

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cv-11999—Linda V. Parker, District Judge.

Decided and Filed:  July 2, 2021

Before:  SILER, WHITE, and STRANCH, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Ronald G. Acho, CUMMINGS, MCCLOREY, DAVIS & ACHO, PLC, Livonia,
Michigan, for Appellant.  John R. Canzano, Benjamin L. King, MCKNIGHT, CANZANO,
SMITH, RADTKE & BRAULT, P.C., Royal Oak, Michigan, for Appellees.

───────────────

**OPINION**

───────────────

  JANE B. STRANCH, Circuit Judge.  Adamo Demolition Company sued the International
Union of Operating Engineers Local 150 (the Union) and its president for various tort claims
arising out of a dispute over staffing one of Adamo's projects.  The district court found Adamo's
claims preempted under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C.

§ 185, because the tort claims were inextricably intertwined with and depended on the requirements of the collective bargaining agreement governing the project. It dismissed the case. On appeal, Adamo argues that the district court committed a host of errors, including denying Adamo's motion to remand to state court and misapplying the concept of federal labor law preemption. For the reasons that follow, we **AFFIRM**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Adamo frequently works with the International Union of Operating Engineers on projects across the country. The Union was awarded a subcontract from Commercial Contracting Corporation (CCC or the Contractor) to work on a demolition project at the Ford Motor Company assembly plant in Chicago. In March 2018, Adamo contacted the Union to obtain the workforce for its demolition job.

The parties do not dispute that the National Maintenance Agreement (NMA), a nationwide collective bargaining agreement that covers projects for large industrial companies such as Ford, governed the demolition project. Article XIX of the NMA, entitled "Hiring and Transfer of Craft Workers," provides, in part:

> The Employer agrees to hire Craft Workers in the area where work is being performed or is to be performed in accordance with the hiring procedure existing in the area; however, in the event the Local Union is unable to fill the request of the Employer for employees within a forty-eight (48) hour period after such request for employees (Saturdays, Sundays and Holidays excepted), the Employer may employ workers from any source. (R. 6-2, NMA, at PageID 129)

The NMA also requires that unions provide skilled and adequately trained workers. It contains dispute resolution processes that contractors and subcontractors are required to follow for disputes that arise under the NMA. Article VI of the NMA states that "all disputes and grievances arising out of work performed under this Agreement involving the meaning or interpretation of any provision in this Agreement" are to be resolved using a series of escalating steps, starting with discussions between the union steward and the employer, moving to a determination by the NMA's policy committee, and finally submitting the dispute to an arbitrator. (*Id.* at PageID 123)  The arbitrator "shall only have jurisdiction and authority to

interpret, apply or determine compliance with the provisions of this Agreement. Any award of the Arbitrator shall be final and binding upon the Employer and the Union." (*Id.* at PageID 124) The NMA also provides that "there shall be no lockouts by the Employer and no strikes, picketing, work stoppages, slow downs or other disruptive activity for any reason by the Union or by any employee." (*Id.* at PageID 130)

Adamo filed suit in Wayne County Circuit Court and Defendants subsequently filed a Joint Notice of Removal to federal court. Adamo's complaint did not attach or explicitly reference the NMA, but Defendants attached it to their motion to dismiss. The complaint alleges that Adamo requested the Union to provide 47 qualified operators for its Ford job. It allegedly told the Union that the project was time sensitive and that an insufficient number of qualified workers would cause significant damage to Adamo and could create an unsafe work environment. Adamo claims that the Union "willfully refused to provide Adamo contact information for proposed workers, refused to give reasonable assurances to Adamo that operators were experienced, trained and qualified before they were dispatched, and refused to fulfill Adamo's request to verify and confirm their qualifications." (R.1, Complaint, at PageID 22, ¶ 27) It also alleges that the Union sent unqualified workers, who created unsafe working conditions and caused damage to the plant for which Adamo was liable. Adamo claims that a Union representative stated to Adamo's Executive Vice President, "Off the record, the Union sent me over here to cause trouble for Adamo." (*Id.* at PageID 23, ¶ 29)

Adamo partially staffed the project with its own workers. It alleges that the Union ordered these workers to stop work immediately and "[g]et off the machines." According to Adamo, the Union used "pressure tactics and intimidation" to displace the experienced workers it brought to the job and replace them with unqualified workers. As a result of the Union's interference, Adamo claims it breached its obligations to CCC and to Ford.

Adamo also contends that the Union and its president have been "intentionally and maliciously publishing to third parties unprivileged, injurious, false and defamatory statements concerning Adamo," which "are affecting Adamo's good reputation with operators, employees,

the community at large, and other business alliances." (*Id.* at PageID 24, ¶¶ 37–38) The complaint provides no specific examples of such statements.

Adamo's complaint lodged six counts against the Union and its president. Count I is for tortious interference with contract with CCC. Count II is for tortious interference with business relationships or expectancies with CCC. Count III is for tortious interference with business relationships or expectancies with Ford. Count IV is for tortious interference with business relationships or expectancies with the Union operators. Count V is for injurious falsehood. And Count VI is for slander/defamation. Defendants removed the action to federal court and moved to dismiss, and Adamo sought remand.

Adamo argued that its tort claims could not be reviewed in arbitration because their resolution did not require interpreting the NMA, but the district court concluded that § 301 of the LMRA preempted all Adamo's claims and it granted the motion to dismiss and denied the motion to remand. Finding that the NMA was integral to the complaint, the court reasoned that § 301 fully preempted Adamo's tortious interference claims because "[w]hether Defendants' conduct was justified or 'improper' is inextricably intertwined with and dependent upon the terms of the NMA." (R. 16, Opinion, at PageID 368)

Turning to Adamo's injurious falsehoods and defamation claims, the district court noted that only two specific statements were included in the complaint—the instructions for the workers to get off the machines and to stop working. The court found that these statements were published in the context of a labor dispute, and required a showing of actual malice as the term is defined in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). It determined that the falsity of the statements in the complaint is dependent on the terms of the NMA and held that these claims were also preempted. In the alternative, the district court stated that these claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because neither statement Adamo identified in the complaint was an objective statement of fact, and neither statement concerned Adamo. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

This court reviews de novo the grant of a motion to dismiss under Rule 12(b)(6). *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). Likewise, we review denial of a motion to remand de novo. *City of Warren v. City of Detroit*, 495 F.3d 282, 286 (6th Cir. 2007).

### B. Labor Law Preemption

Adamo first argues that the district court relied on disputed facts when it drew conclusions based on the terms of the NMA. It also complains that the district court erred generally in accepting Defendants' version of the facts instead of accepting the factual allegations in the complaint as true.

But the complaint is replete with references to the requirements of the NMA. For example: "Adamo also placed the Defendant Union on notice, multiple times and throughout the pendency of the Project, that any failure or refusal to provide *the required number of experienced, trained and qualified operators* would interfere with, harm and hinder Adamo's ability to meet its contractual duties to CCC and Ford." (R.1 at PageID 22, ¶ 25) (emphasis added) This requirement comes directly from the NMA. Adamo does not dispute that the NMA is genuine or that the NMA governed the relationship between itself and the Union. The NMA is therefore integral to the complaint and the district court properly considered it. There is, moreover, no indication in the district court's opinion that it drew any *factual* inferences in favor of the Defendants in violation of the standard governing a motion to dismiss.

We turn to the gravamen of the dispute, which centers around federal labor law and the capaciousness of § 301 preemption. Over fifty years ago, the Supreme Court set out the core principles undergirding labor-law preemption, explaining that "[t]he ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace." *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962). Essential to this order is "[t]he need to preserve the effectiveness of arbitration." *Allis-Chalmers Corp. v Lueck*, 471 U.S. 202, 219 (1985). The Supreme Court noted arbitration's centrality in labor law:

> A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance.

*Id.* at 220 (citation omitted).

To preserve the effectiveness of labor arbitration and promote uniformity in labor disputes, § 301 of the LMRA provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a). When it enacted § 301, "Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Allis-Chalmers Corp.*, 471 U.S. at 209–10 (quoting *Lucas Flour Co.*, 369 U.S. at 104). Therefore, "a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law." *Id.* at 210. The complete preemption doctrine, applied "primarily in cases raising claims pre-empted by § 301 of the LMRA," holds that "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).

The Supreme Court has also explained the necessarily broad reach of preemption in the labor law context. "If the policies that animate § 301 are to be given their proper range, however, the pre-emptive effect of § 301 must extend beyond suits alleging contract violations." *Allis-Chalmers Corp.*, 471 U.S. at 210. To create uniformity, courts must not "elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." *Id.* at 211. Plaintiffs may not evade preemption by failing to plead "necessary federal questions." *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998) (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 22 (1983)). "The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim." *Id.*; *see also Avco Corp. v. Aero Lodge No.*

*735, Int'l Ass'n of Machinists*, 390 U.S. 557, 560 (1968) (upholding removal based on § 301 preemption).

The Supreme Court has also noted that "as long as the state-law claim can be resolved without interpreting the [collective bargaining] agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988). We too have instructed that § 301 "preempts state law rules that substantially implicate the meaning of collective bargaining agreement terms." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994). In *DeCoe*, we laid out the two-step test for determining whether a tort claim is sufficiently intertwined with the meaning of a collective bargaining agreement to make it subject to federal preemption: the court must first "examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms." *Id.* (citing *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1037 (6th Cir. 1989)). A claim is independent of a labor agreement if all elements of it can be proven without interpreting that labor agreement. *Dougherty v. Parsec, Inc.*, 872 F.2d 766, 768 (6th Cir. 1989). If the claim does not require interpreting the collective bargaining agreement terms, the court must then assess "whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law." *DeCoe*, 32 F.3d at 216. If the claim "does not invoke contract interpretation" and "is borne of state law," then it is not preempted. But if the claim does require interpretation of the agreement or the agreement created the right, the claim is preempted. *Id.*

Courts engaging in this analysis are not bound by the "well-pleaded complaint" rule. *Id.* Rather, a court "looks to the essence of the plaintiff's claim, in order to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort." *Id.* (citing *Terwilliger*, 882 F.2d at 1037). "[N]either a tangential relationship to [a collective bargaining agreement] nor the defendant's assertion of the contract as an affirmative defense" makes a claim dependent on a collective bargaining agreement. *Id.* (citing *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 800 (6th Cir. 1990)). Our task, then, is to assess whether the essence of Adamo's claims involves interpreting the NMA or its claims hinge on rights created by the NMA.

1. Tortious Interference Claims

Adamo brings claims against the Union and its president for tortious interference with contract and tortious interference with business relationships. Under Michigan law, these are distinct claims. In Michigan, tortious interference with contract requires "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848–49 (Mich. Ct. App. 2005). On the other hand, the elements of a tortious interference with business relationships in Michigan are:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Courser v. Allard*, 969 F.3d 604, 620 (6th Cir. 2020).

Although these two types of tortious interference claim are distinct, they share a common requirement: "[o]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 157–58 (Mich. Ct. App. 2004) (quoting *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002)). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992).

In its tortious interference with contract claim, Adamo alleges that "Defendants' actions . . . unjustifiably instigated a breach of the contract [with the Contractor]." (R.1 at PageID 25, ¶ 43) These alleged actions included failing to provide the qualified workforce as specified in the NMA, failing to allow Adamo to check the proposed workers' qualifications, providing unqualified workers, intimidating the qualified workers Adamo had staffed on the project, and instructing those workers to stop working. A reviewing court will plainly have to interpret the

terms of the NMA to determine the scope of the Union's responsibilities concerning the workforce, including what constitutes a qualified worker under the Agreement and whether the Union was justified in ordering Adamo's workers off the machines. These inquiries will necessarily entail analysis of the parties' responsibilities under the NMA's terms. This claim meets the first prong of *DeCoe*'s preemption analysis. The district court did not err in concluding that § 301 preempts Adamo's tortious interference with contract claim.

Next, Adamo brings three claims of tortious interference with business relationships: with CCC, Ford, and the Union operators. Adamo essentially claims that the Union's conduct toward it and its workforce had the effect of interfering with these three business relationships. Even if Adamo had adequately pleaded malice, it has not pleaded any acts that could "never be justified under any circumstances." *Prysak*, 483 N.W.2d at 635. It has therefore not pleaded a per se wrongful act. And analyzing whether particular acts could be justified requires a court to examine the relationship between Adamo and the Union, which in turn requires construing the NMA and its terms. The propriety of the Union's actions vis-à-vis its own workers and Adamo's workers cannot be assessed without reference to the rights and responsibilities created by the NMA. Therefore, Adamo's tortious interference with business relationships claims are also preempted under *DeCoe*'s first step.

Because these claims are all preempted, the district court did not err in denying Adamo's motion to remand, as it could exercise supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a). *See, e.g.*, *Kitzmann v. Loc. 619-M Graphic Commc'ns Conf. of Int'l Brotherhood of Teamsters*, 415 F. App'x 714, 719–20 (6th Cir. 2011).

## 2. Injurious Falsehood and Slander/Defamation Claims

We laid out the elements of an injurious falsehood claim in *Neshewat v. Salem*, 173 F.3d 357 (6th Cir. 1999). A claim of injurious falsehood in Michigan requires showing a false, published statement that is harmful to the interests of the plaintiff; intent to cause harm or a recognition that harm could result; and knowledge of the statement's falsity or reckless disregard for its falsity. *Id.* at 362–63. Similarly, defamation in Michigan requires showing a false and defamatory statement concerning the plaintiff, unprivileged publication to a third party, a

showing of at least negligence on the part of the publisher, and damages. *DeCoe*, 32 F.3d at 217. These claims both require the showing of a false statement.

"A plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Thomas M. Cooley L. Sch. v. Doe 1*, 833 N.W.2d 331, 341 (Mich. Ct. App. 2013). There are only three specific statements uttered by members of the Union that Adamo alleges in its complaint. One is a Union representative allegedly saying to Adamo's Executive Vice President, "Off the record, the Union sent me over here to cause trouble for Adamo." (R.1 at PageID 23, ¶ 29) Adamo does not contend that this statement is false. The other two statements involve Union members allegedly telling Adamo's workers to "[g]et off [the] machinery" and "[i]mmediately stop working." (*Id.* at PageID 33, ¶ 106) These are imperatives, and it is not clear semantically that they can be considered categorically true or false. But to the extent that the inquiry is assessing whether the Union had justification to issue those orders to Adamo's workers, this analysis is inextricably intertwined with and depended on the requirements of the governing collective bargaining agreement, the NMA. There is simply no way to determine whether these commands were unjustified or defamatory without evaluating the rights and responsibilities of the parties created by the NMA. Therefore, the district court did not err in dismissing Adamo's injurious falsehood and slander/defamation claims.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Adamo's claims as preempted.