RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CNH AMERICA LLC,

                *Plaintiff-Appellant,*

         *v.*

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA (UAW),

                *Defendant-Appellee.*

No. 09-2001

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-10584—Patrick J. Duggan, District Judge.

Argued: June 8, 2010

Decided and Filed: May 16, 2011

Before: DAUGHTREY, GILMAN and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Bobby R. Burchfield, McDERMOTT WILL & EMERY LLP, Washington, D.C., for Appellant. Julia Penny Clark, BREDHOFF & KAISER, P.L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** Bobby R. Burchfield, Jason A. Levine, McDERMOTT WILL & EMERY LLP, Washington, D.C., Norman C. Ankers, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Detroit, Michigan, for Appellant. Julia Penny Clark, BREDHOFF & KAISER, P.L.L.C., Washington, D.C., for Appellee.

      SUTTON, J., delivered the opinion of the court, in which GILMAN, J., joined. DAUGHTREY, J. (pp. 16–26), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

SUTTON, Circuit Judge. This appeal, one of a never-ending string of healthcare-benefit disputes in this circuit, turns (unsurprisingly) on the interrelationship of two lawsuits. In the first lawsuit, a group of retirees, funded by the UAW, obtained a preliminary injunction preventing CNH from terminating their healthcare benefits. *See Yolton v. El Paso Tenn. Pipeline Corp.*, No. 02-75164 (E.D. Mich.) R.80. That litigation is still pending. *See* No. 02-75164 (E.D. Mich.). In the second lawsuit, CNH sued the UAW, claiming that the UAW's participation in the first lawsuit violated a collective bargaining agreement (CBA) between the parties and that the UAW, during the negotiations of the CBA, committed several state law torts. In addressing the second lawsuit, the one at issue in this appeal, the district court dismissed the claims, holding that the UAW did not breach the CBA and that federal law preempted CNH's additional state law claims. For the reasons set forth below, we affirm the district court's conclusion that the UAW did not breach the relevant CBA but reverse its preemption decision.

I.

Here is the cast of characters:

* CNH America makes farming and construction equipment and is the plaintiff in this case.

* Case Corporation is CNH's former name.

* Tenneco, Inc. was the parent company of CNH until 1994, when Tenneco sold its interest in CNH in an initial public offering (the reorganization).

* El Paso Tennessee Pipeline Company is the current name of Tenneco.

* UAW is a union that represented the relevant employees of all of these companies before they retired and is the defendant in this case.

Here is the plot, such as it is:

Between 1971 and 1994, Case entered into several CBAs with the UAW in which Case allegedly agreed to provide free health insurance to retirees and their surviving spouses if the employees retired before the expiration of the CBA. As part of the reorganization in 1994, CNH assumed Case's CBA obligations, but Tenneco promised to indemnify CNH for any pre-reorganization retiree healthcare expenses. *See Reese v. CNH America LLC*, 574 F.3d 315, 317–18 (6th Cir. 2009); *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 574–77 (6th Cir. 2006).

In 1997, CNH and the UAW began negotiating a new CBA. At about that time, Tenneco told the pre-reorganization retirees that it would be capping the company's obligations to pay retiree healthcare benefits and that the retirees would soon have to pay $56 per month in health-insurance premiums, labeled "above-cap costs." The UAW objected to the change, claiming that CNH remained responsible for the pre-reorganization retirees' healthcare benefits, and this dispute became a "key issue" in the 1998 negotiations. R.1 ¶ 18.

The parties reached what seemed to be a compromise. CNH and the UAW formed a Voluntary Employees' Beneficiary Association (VEBA), *see* I.R.C. § 501(c)(9), to fund the retirees' above-cap costs. CNH contributed $24.7 million to the VEBA, and the UAW contributed an additional $2.8 million. The parties documented the 1998 CBA in a 172-page agreement, and they documented the VEBA agreement in the following three-paragraph "letter of understanding":

> During the 1998 negotiations, [CNH] and [UAW] had extensive discussions of the medical plan maintained by [Tenneco] for pre IPO retirees. Although these retirees retired prior to the formation of [CNH] and sales of its stock to the public, [CNH] has agreed with the UAW to create a VEBA and to fund it with $24,700,000 in order to pay a portion of the costs of benefits above the cost cap limit under the [Tenneco] Plan (plus $300,000 in 1998 to pay for the 1998 Medicare Part "B" [c]overage).

> An additional 2.8M from the economic settlement will be contributed for total VEBA funding of approximately $27,800,000.

>The parties recognize that the VEBA is intended to complete [CNH]'s funding of the above cap cost and that [CNH] will not be required to make any further contributions to the VEBA from its own funds.

R.1.2 at 96.  The CBA referenced and incorporated the VEBA agreement.

Medical costs and insurance premiums rose more than expected, and the pre-reorganization retirees exhausted the VEBA funds in August 2002, two years short of the 2004 culmination of the 1998 CBA.  In October 2002, the UAW and six retirees filed a class-action lawsuit against CNH and Tenneco seeking "lifetime, free health care benefits."  R.1 ¶ 30; *Yolton*, 435 F.3d at 574.  In December, the UAW and the retirees voluntarily dismissed the suit without prejudice, and the retirees immediately re-filed the lawsuit without the UAW as a party, although the UAW continued to fund the litigation. In 2003, the district court preliminarily enjoined CNH from discontinuing the payment of the retirees' above-cap costs during the lawsuit and granted CNH summary judgment on its indemnification claim against Tenneco.  R.1 ¶ 34; *Yolton v. El Paso Tenn. Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2003).  A panel of our court affirmed the preliminary injunction and indemnification ruling.  *See Yolton*, 435 F.3d at 571.

In August 2008, CNH sued the UAW, claiming that, by funding the *Yolton* litigation, the UAW had breached a covenant not to sue contained in the VEBA agreement.  CNH also added several tort claims under Wisconsin law arising from the 1998 negotiations:  breach of an implied warranty of authority; negligent misrepresentation; and intentional misrepresentation.  The UAW filed a motion to dismiss, which the district court granted, concluding that the UAW did not breach the VEBA agreement, that the Labor Management Relations Act (LMRA or Act) preempted CNH's state law claims and in the alternative that CNH failed adequately to plead its intentional misrepresentation claim.

II.

By funding the *Yolton* litigation, CNH claims, the UAW breached the third paragraph of the VEBA agreement:

> The parties recognize that the VEBA is intended to complete [CNH]'s funding of the above cap cost and that [CNH] will not be required to make any further contributions to the VEBA from its own funds.

R.1.2 at 96. As CNH reads this provision, it contains a "covenant not to sue," CNH Br. at 16–24, which the UAW allegedly breached when it initiated, then agreed to fund, the *Yolton* litigation.

The text of this provision shows otherwise. Not a word in the paragraph says that the UAW promises not to sue CNH over the pre-reorganization retirees' healthcare benefits. And not a word in the paragraph even mentions the UAW or its obligations. Of the five words one might expect to see in such a promise—UAW, covenant, not, sue, CNH—only two of them (CNH and not) appear in the provision. That is because the provision focuses on *CNH*'s burdens and benefits: CNH will "fund" the above-cap costs, and CNH will not have to contribute any additional funds to the VEBA. We break no new contractual ground or any convention of meaning by insisting that a provision purporting to obligate the UAW to do something, or refrain from doing something, must mention the obligor (the union) and the nature of the obligation (not to sue) by name.

The first two paragraphs of the VEBA agreement do not fill this gap. Everything in the agreement points to a foundation for a compromise: The agreement describes the extensive negotiations over the retirees' healthcare costs and the two sides' obligations to contribute to the VEBA, not to any obligations with respect to suing the other. Although these two paragraphs and the third one may supply a firm foundation for the argument that CNH committed to offer $24.7 million, and no more, to resolve any healthcare obligations with respect to these retirees, that suggests CNH has a basis for winning the *Yolton* litigation, not that the UAW had to refrain from initiating it. The VEBA could provide CNH with a defense to a lawsuit without precluding the UAW from suing to find out.

Think of it this way. Had the agreement contained such a covenant, that would mean the UAW could not have sued CNH even to enforce the company's commitment to fund the VEBA with $24.7 million. Why would the UAW enter such an agreement, one that obligated CNH to do something but prohibited the UAW from enforcing it? Had that been an acceptable solution to the parties' ongoing disagreements, they could have resolved them long ago. The most that CNH can say, if we read all of the inferences its way, is not that the agreement contains a general covenant by the UAW not to sue CNH, but that it contains a covenant not to win certain types of additional funding obligations from CNH. That, however, is not a covenant not to sue; it is a defense to a lawsuit.

The same point defeats CNH's contention that the agreement is ambiguous, in view of uncertainties about the meaning of "funding" or "further contributions." The relevant question is whether the agreement contains a covenant not to sue, and it contains no ambiguity on *that* score. *See Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008). Any other ambiguities with respect to CNH's ongoing funding obligations go to the merits of the *Yolton* litigation, *see* Docket No. 02-75164 (E.D. Mich.), not to the merits of this case.

But why, CNH insists, would it pay $24.7 million in exchange for nothing, all while insisting during negotiations it was not responsible for the retirees' healthcare costs? That again provides an answer (though in the form of another question) to the merits of the *Yolton* litigation, not an explanation as to how the words of the VEBA agreement amount to a covenant not to sue, even to sue to collect the $24.7 million that CNH agreed to pay. The district court correctly rejected this argument.

### III.

That leads to the next key subject of the district court's order: whether § 301 of the LMRA preempts CNH's state law claims. We think it does not.

Section 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

61 Stat. 156, § 301, *codified at* 29 U.S.C. § 185(a).  With these words, § 301 confers federal jurisdiction over the meaning of CBAs and other collective-bargaining disputes that do not otherwise satisfy the general requirements for obtaining federal jurisdiction. *See* 28 U.S.C. §§ 1331, 1332.  The statute also preempts state law claims that "substantially depend upon" the meaning of a CBA. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962).

In determining what the key phrase—"[s]uits for violation of [labor] contracts"—means, the Supreme Court has refused to be distracted by labels.  In *Allis-Chalmers*, the Court held that a *tort* claim for breach of the duty of good faith and fair dealing was preempted because it was essentially a contract dispute.  A claimant may not sidestep preemption, the Court held, merely by recasting a contract claim as a tort claim.  471 U.S. at 218, 220.  So also for the reverse:  Claimants may not create a § 301 claim (and federal jurisdiction) by recasting a tort claim as a contract claim.  Section 301 preempts those claims which are "filed *because a contract has been violated*." *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 657 (1998). In *Textron*, the plaintiffs claimed that, during the relevant contract negotiations, Textron fraudulently withheld information that the plaintiffs had requested.  Such *pre-contractual* conduct, the Court held, amounted to a tort claim, not a breach-of-contract claim, and accordingly did not come within § 301, *id.* at 655, 658 (and, it follows, would not be preempted by § 301, *see Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392–95 (1987)).

Two cases from our circuit complete the picture.  In *Alongi v. Ford Motor Co.*, 386 F.3d 716 (6th Cir. 2004), and *Northwest Ohio Administrators v. Walcher & Fox, Inc.*, 270 F.3d 1018 (6th Cir. 2001), we held that § 301 did not preempt the plaintiffs'

fraudulent inducement claims. In both instances, the plaintiffs claimed that, during contract negotiations, the defendants made misrepresentations to the plaintiffs, inducing them to sign CBAs or related contracts. Section 301 did not preempt the plaintiffs' claims because the claims were not "suit[s] for violation of contracts." *Alongi*, 386 F.3d at 725; *see Nw. Ohio Adm'rs*, 270 F.3d at 1031. Any alleged misrepresentations were independent of the CBAs because "the rights and duties at issue ar[o]se from [the defendants'] actions *prior to the formation*" of the agreements. *Nw. Ohio Adm'rs*, 270 F.3d at 1031 (emphasis added); *see Alongi*, 386 F.3d at 725–26.

CNH included three tort claims in its complaint: (1) breach of an implied warranty of authority, (2) negligent misrepresentation and (3) intentional misrepresentation. A party is liable for breach of an implied warranty of authority if he falsely represents that he has the power to bind another in contract. Restatement (Second) of Agency § 329; *Martinson v. Brooks Equip. Leasing, Inc.*, 152 N.W.2d 849, 855 (Wis. 1967) (adopting the Restatement). Claims for intentional and negligent misrepresentation require proof of a material, false representation and detrimental reliance. *See Grube v. Daun*, 496 N.W.2d 106, 114 (Wis. Ct. App. 1992); *see also Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*, 590 N.W.2d 1, 5 (Wis. Ct. App. 1998).

CNH's three tort claims are analytically distinct but of a piece for purposes of § 301. The same factual predicate underlies all three claims: that the UAW explicitly and implicitly represented that it had the authority to bind the retirees during the CBA negotiations. "From the beginning of the negotiations," CNH claims, "[t]he UAW . . . made clear that it intended to negotiate with CNH . . . on behalf of the Pre-Reorganization Retirees." R.1 ¶18. "At no time did the UAW indicate, nor did CNH . . . have any reason to believe, that the UAW lacked authority to negotiate . . . on behalf of the Pre-Reorganization Retirees." *Id.* ¶ 24; *see* ¶¶ 44, 51. CNH's claims thus all turn on the UAW's pre-contractual conduct. None of them requires the court to interpret the CBA. All that the district court must do is determine whether the UAW made these statements and whether CNH reasonably relied on them.

In this respect, CNH's tort claims parallel the fraudulent inducement claims at issue in *Textron*, *Alongi* and *Northwestern Ohio Administrators*. *Alongi* held that § 301 did not preempt the plaintiffs' fraudulent inducement claims because the court had to determine only "whether [the defendants] made the statements alleged, and whether plaintiffs reasonably relied on them." 386 F.3d at 726. These are the same steps the district court will use to decide CNH's state law claims: Did the UAW represent that it had the authority to bind the pre-reorganization retirees and was CNH's reliance on the alleged representations reasonable? (The second step is not even needed for the implied warranty of authority claim.) Neither of these questions turns on an interpretation of the VEBA agreement. As in these cases, so here: CNH's "rights and duties . . . ar[o]se from the Union's actions *prior* to the formation" of any CBAs. *Nw. Ohio Adm'rs*, 270 F.3d at 1031 (emphasis added).

The UAW counters that it could largely defeat CNH's claims by showing that the agreement did not release CNH's overall liability to the pre-reorganization retirees. Perhaps so. But the district court does not *have* to decide whether the VEBA agreement constituted a release in order to resolve CNH's tort claims. These claims require the district court to decide only whether the UAW made these alleged representations and whether CNH reasonably relied on them. *See Alongi*, 386 F.3d at 726. Whether the VEBA agreement amounts to a release goes to CNH's damages, *see* Restatement (Second) of Agency § 329 cmt. j; Restatement (Second) of Torts § 525, not the substance of its tort claims, which are independent of the 1998 CBA. In these kinds of circumstances, "federal law would govern the interpretation of the agreement to determine the proper damages, [but] the underlying state-law claim, not otherwise preempted, would stand." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 n.12 (1988).

Even if the UAW ultimately establishes that, under the VEBA, CNH remains on the hook for healthcare benefits to the pre-reorganization retirees, that would not end CNH's potential tort recovery. There remains another benefit for the pre-reorganization retirees that the UAW purported to give up: the right to make CNH contribute additional

pre-funded benefits to the VEBA.  *See Yolton v. El Paso Tenn. Pipeline Co.*, 668 F. Supp. 2d 1023, 1033 (E.D. Mich. 2009); *cf. UAW v. Gen. Motors Corp.*, 497 F.3d 615, 632–33 (6th Cir. 2007).  If the UAW lacked the authority to bind the retirees, it did not have the authority to make *this* deal, leaving CNH with potentially valid state law claims.

But CNH (and the UAW) signed the agreement.  Doesn't that require us to interpret the CBA?  Not that we can tell.  Both the plaintiffs in *Alongi* and *Northwestern Ohio Administrators* "relied" on the defendants' misrepresentations by signing contracts, and yet we still determined that § 301 did not preempt those claims.  The fact that a plaintiff (CNH) signs a CBA does not depend on the meaning of the CBA.  For our purposes, it matters only that CNH claims to have taken on additional obligations based on the UAW's alleged misrepresentations, all of which occurred prior to the formation of the CBA.  This dispute does not turn on, or for that matter "substantially depend upon," the meaning of the agreement.

A few responses to our dissenting colleague are in order.  To decide the materiality of the UAW's alleged misrepresentations, the dissent maintains, a court will have to interpret the VEBA agreement.  Yet this assumes, we think incorrectly, that materiality is a retrospective question, that a court looks back on the agreement the parties signed in order to determine whether pre-contractual statements led to the agreement.  Materiality is a prospective, not a retrospective inquiry.  The question is whether, given the context of the statement and the parties' positions, the UAW's statements were material to CNH and whether CNH reasonably relied on the statements.  The question is not whether, given the contract's terms, the UAW's statements were material to the agreement.  *Alongi* and *Northwest Ohio Administrators* confirm the point.  Were materiality decided retrospectively, both cases should have come out the other way because the courts would have had to examine the terms of the respective contracts in order to decide whether the defendants' pre-contractual representations were material to the plaintiffs' decision to enter the agreements.  More to the point, why would

materiality depend on what occurred *after* the UAW's allegedly tortious conduct—after, in other words, its misrepresentation?

Keep in mind that this case comes to us in the context of a Rule 12(b)(6) motion. That means CNH has to allege only that the UAW's statements were material because they pertained to a key dispute in the negotiations, not that the statements were material to the contract ultimately negotiated. Accepting these allegations as true at this stage of the litigation, we not only can, but we must, say that they are material to the misrepresentation claim without having to factor in the meaning of the agreement, whether a CBA, a VEBA, a settlement of a lawsuit or any other contract, that the misrepresentations ultimately caused.

While the VEBA agreement may pertain to CNH's damages, the Supreme Court has underscored that "*Lingle* makes plain . . . that when liability is governed by independent state law, the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by 301." *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994). We break no new ground in holding that a tort claim that turns entirely on extra-contractual or pre-contractual conduct is not preempted even when damages are calculated by looking to a collective bargaining agreement. *See, e.g.*, *Williams v. Nat'l Football League*, 582 F.3d 863, 876–77 (8th Cir. 2009); *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1082 n.13 (9th Cir. 2005). Long after the Rule 12(b)(6) stage of this case, it may turn out that the meaning of the VEBA bears on CNH's damages, but that does not make CNH's claim "substantially depend[]" on the meaning of the agreement.

IV.

Because § 301 does not preempt CNH's state law claims, we must decide whether CNH adequately pleaded these claims. The district court held that CNH alleged sufficient facts to state claims for breach of an implied warranty of authority and for negligent misrepresentation, but failed to state a claim for intentional misrepresentation.

CNH's allegations are not extensive, but they are sufficient to state a claim for relief for breach of an implied warranty of authority. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). CNH alleges that (1) during the 1998 negotiations the UAW led CNH to believe that it had the authority to negotiate on behalf of the pre-reorganization retirees and (2) if the UAW did lack authority to bind the pre-reorganization retirees it breached its implied warranty of authority. CNH pointed to several acts generating the implied warranty: the "UAW's ratification" of the VEBA agreement, R.1 ¶ ¶ 24, 43, how the UAW presented itself during negotiations and other statements and conduct during the negotiations. Discovery could shed light on what the UAW did to give CNH the impression that it had the authority to negotiate on behalf of the pre-reorganization retirees. *See Twombly*, 550 U.S. at 556.

CNH notably avoids stating in its pleadings that the UAW lacked authority to negotiate on behalf of the retirees. At first glance, this might seem to be a fatal flaw: a breach of an implied warranty of authority requires an agent to contract "on behalf of [a principal] whom he has no power to bind." Restatement (Second) of Agency § 329. But CNH alleges sufficient facts to give rise to an inference that the UAW did lack authority to negotiate on behalf of the retirees even if CNH does not explicitly say that the UAW did not have the authority to do so. CNH notes that the pre-reorganization retirees have filed documents in *Yolton* claiming that the UAW lacked authority to negotiate the VEBA agreement and other similar allegations, *see, e.g.*, R.1 ¶¶ 55, 61. These factual allegations suffice to make CNH's claim for relief plausible. *Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009).

A similar conclusion applies to CNH's claim for negligent misrepresentation. Under Wisconsin law, a plaintiff must establish four elements to bring a claim for negligent misrepresentation: (1) negligence in making (2) a misrepresentation (3) that is material and (4) that causes detrimental reliance. *Grube*, 496 N.W.2d at 114–15. In its complaint, CNH made allegations with respect to all four elements of the claim, and its factual assertions suffice to withstand a motion to dismiss. CNH alleges that the UAW "led [CNH] to believe that the UAW had authority to negotiate for and bind the

Pre-Reorganization Retirees." R.1 ¶ 60. And CNH incorporated its earlier allegations about the UAW's misrepresentations during the negotiations: "The UAW . . . made clear that it intended to negotiate . . . on behalf of the Pre-Reorganization Retirees"; "the UAW led CNH [] to believe . . . that the UAW had authority to negotiate . . . on behalf of the Pre-Reorganization Retirees"; and "the UAW acted at all times as if it had the authority to bind the Pre-Reorganization Retirees." R.1 ¶¶ 18, 44, 58. So long as these allegations are "plausible," as indeed they are, they suffice to meet the modest notice-pleading requirements of Civil Rule 8(a). *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 556–57.

To the extent CNH independently argues that the UAW's misrepresentation was an omission—namely, a failure to tell CNH that it lacked authority over the pre-reorganization retirees—that is a variation on the same theme. *See Grube*, 496 N.W.2d at 115. Here, too, the requisite allegation is made: CNH alleges that "the UAW had a duty to disclose to [CNH] any limitations on the UAW's authority to bind the Pre-Reorganization Retirees]" due to "[t]he UAW's unique relationship with" the retirees. R.1 ¶ 50. And here, too, the theory is a plausible one in light of CNH's other factual allegations: "The UAW led CNH . . . to believe . . . that the UAW had authority to negotiate . . . on behalf of the Pre-Reorganization Retirees," and "the UAW acted at all times as if it had the authority to bind the Pre-Reorganization Retirees." R.1 ¶¶ 18, 44, 58. Whether the UAW at the outset had any duty to disclose its authority over the retirees before the UAW and CNH commenced negotiations is beside the point. If CNH's allegations are believed, it is certainly plausible that the UAW had a duty to "prevent [its] partial or ambiguous statement of the facts from being misleading." Restatement (Second) of Torts § 551; *In re Lecic's Estate*, 312 N.W.2d 773, 781 (Wis. 1981) (relying on the Restatement). Like the district court, we thus conclude that CNH adequately pleaded its negligent misrepresentation claim. *See Twombly*, 550 U.S. at 556.

That leaves CNH's claim for intentional misrepresentation. The elements of this action are (1) an intentional falsity (2) that is material (3) that the defendant intends to cause (4) and that does cause detrimental reliance. *Grube*, 496 N.W.2d at 113–14. The

problem for CNH, and the thing that distinguishes this claim from negligent misrepresentation, is the reality that intentional misrepresentation amounts to a type of fraud under Wisconsin law. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 211, 214 (Wis. 2005). When it comes to pleading requirements, the Federal Rules of Civil Procedure draw a distinction between fraud and other torts. Under Rule 9(b), a plaintiff must say things in a complaint that it need not say in filing a run-of-the-mill negligence action. Namely, the plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That includes, at a minimum, "the time, place, and content" of the misrepresentation. *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 518 (6th Cir. 2009).

CNH did not meet this requirement. Nowhere in its complaint does it say when and where the UAW made an intentional misrepresentation about its purported authority to negotiate on behalf of the retirees. All that the complaint contains are general allegations, which may suffice to meet the notice-pleading requirements of Civil Rule 8(a) in the context of a negligence action but do not meet the particularity requirements of Civil Rule 9(b) in the context of a fraud action. We thus agree with the district court's decision to dismiss this claim.

CNH alternatively argues that the district court should not have dismissed this claim with prejudice. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 698 (6th Cir. 2004). Ordinarily, if a district court grants a defendant's 12(b)(6) motion, the court will dismiss the claim without prejudice to give parties an opportunity to fix their pleading defects. 2-8 James Wm. Moore, *Moore's Fed. Practice*, § 8.10[2] (3d ed.). But if a party does not file a motion to amend or a proposed amended complaint, it is not an abuse of discretion for the district court to dismiss the claims with prejudice. *See PR Diamonds, Inc.*, 364 F.3d at 699; *Begala v. PNC Bank, Ohio*, 214 F.3d 776, 783–84 (6th Cir. 2000). CNH did not file a motion to amend its complaint, and the district court thus acted within its discretion in dismissing CNH's intentional misrepresentation claim with prejudice.

V.

For these reasons, we (1) affirm the district court's decision that CNH failed to state a claim for breach of contract, (2) reverse the court's decision that § 301 preempts CNH's state law claims, (3) affirm its decision that CNH adequately pleaded its implied warranty of authority claim, (4) affirm its decision that CNH adequately pleaded its negligent misrepresentation claim, (5) affirm its decision that CNH did not adequately plead its intentional misrepresentation claim and that the claim should be dismissed with prejudice and (6) remand for further proceedings.

———————————————————————————————

**CONCURRING IN PART AND DISSENTING IN PART**
———————————————————————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part. I agree with the majority's conclusion that the VEBA trust fund agreement does not contain a covenant not to sue and, for that reason, that the UAW's funding of the *Yolton* litigation did not constitute a breach of the collective bargaining agreement (CBA) between the parties to this suit, of which the VEBA agreement was a part. However, I cannot agree with the majority's decision to reverse the district court's sound ruling that CNH America's state-law claims against the UAW are pre-empted by federal law.

That majority decision flows primarily from reliance on, and a misreading of, the Supreme Court's opinion in *Textron Lycoming Reciprocating Engine Division, Avco Corp. v. UAW*, 523 U.S. 653 (1998). In my judgment, as detailed below, the controlling case in this instance is not *Textron* but the Court's earlier opinion in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985), and its precedents and progeny, including *Lingle v Norge Division of Magic Chef, Inc.*, 486 U.S. 399 (1988). Although the majority opinion cites both *Allis-Chalmers* and *Lingle*, my colleagues have failed to note that the latter two cases are wholly distinguishable from *Textron*. For this reason, I dissent from the majority's determination that the plaintiff's state-law claims are not pre-empted. In view of the plaintiff's deliberate decision to pass up the opportunity to seek alternative relief on those claims in the district court, I would affirm the district court's order granting the defendant's motion to dismiss and dismiss the complaint without necessity of a remand.

The complaint filed by CNH America in this case refers to the VEBA trust fund agreement exclusively as a "release of liability." Given our unanimous conclusion that the VEBA trust agreement did not protect CNH America from suit in the *Yolton* litigation, the remaining questions are whether that agreement did, in fact, create a release and, if so, what was actually released. CNH America alleged in its complaint

that the UAW "provided CNH America with a full release from liability for the future cost of the retirees' health care benefits that exceeded an agreed-upon 'cap'." The UAW, on the other hand, denies the existence of such a broad release and reads the agreement to relieve CNH America of precisely what the agreement states, *i.e.*, the need "to make any further contributions *to the VEBA* from its own funds." (Emphasis added.) The resolution of this dispute necessarily requires an interpretation of the CBA and its incorporated VEBA trust agreement, because if there was no release, there is no basis for the state-law claims.

The resolution of the dispute also requires an understanding of the context in which it arose. Hence, at the risk of trying the patience of the reader, especially with regard to the seemingly ever-changing identities of the parties in this litigation, I offer as brief a description of the context of the dispute as possible, as follows.

At the time this litigation was initiated, CNH America was the successor company to Case Corporation (formerly J.I. Case Co.), a subsidiary of Tenneco, Inc. (later El Paso Tennessee Pipeline Company). Case and the UAW had a long history of collective bargaining that had resulted in successive agreements covering, among other things, health benefits for retired employees. In 1993, Case and the UAW agreed to limit the amount of those benefits for accounting purposes,[1] in what has been referred to throughout this litigation as a "cap letter." That agreement also provided that no retiree would have to pay "above-cap costs" for health benefits before April 1, 1998.

When Tenneco reorganized in June 1994, it spun off Case in an initial public offering (IPO). As part of the reorganization, Tenneco retained liability for providing health benefits to those Case employees who retired before the IPO, leaving Case to assume the other obligations under the CBA then in effect. Faced with rapidly escalating costs, however, Tenneco (by then merged with El Paso) notified the pre-IPO retirees in October 1997 that effective April 1, 1998, they would be required to contribute $56 per

---

[1]Under Financial Accounting Standards Board Rule 106, Case Corporation was required to reflect on its balance sheet a liability equal to the present value of future non-pension benefits for retirees.

month for continued health care coverage. *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 576 (6th Cir. 2006).

This notice occurred while Case and the UAW were negotiating a new CBA with a six-year duration, to take effect on April 1, 1998. As part of the new agreement, and despite the fact that El Paso was liable for the cost of health benefits for the pre-IPO retirees, Case agreed to establish a trust fund, under what was described for tax purposes as a Voluntary Employee Benefit Association or VEBA plan,[2] to pay the above-cap costs of the pre-IPO retirees' health care benefits. "'[A]s a show of good will toward the UAW'," Case contributed $24.7 million to the VEBA trust fund while, at the same time, "insist[ing] that it had no legal obligation to pay for the health care benefits." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 576 (6th Cir. 2006). As part of the settlement, the parties agreed that "the VEBA [wa]s intended to complete Case's funding of the above cap cost and that Case w[ould] not be required to make any further contributions to the VEBA from its own funds."

Case and the UAW undoubtedly intended the VEBA trust funds to cover the above-cap costs throughout the six-year term of the 1998 CBA. As it turned out, however, the funds were exhausted by mid-2002, and El Paso notified the pre-reorganization retirees that they would have to contribute $290 in monthly premiums in order to continue receiving health care benefits, increasing to $501 in January 2003. *Id.* at 578. At that point, the pre-IPO retirees filed suit, jointly with the UAW, against both El Paso and Case, insisting that the defendant companies were responsible for the entire cost of the their benefits, including the above-cap amounts. *See UAW v. El Paso Tenn. Pipeline Co.*, Case No. 02-74276 (E.D. Mich. 2003). That action was voluntarily

---

[2]The VEBA "letter of understanding" reads as follows:

During the 1998 negotiations, the Company and Union had extensive discussions of the medical plan maintained by El Paso Natural Gas Company for the pre IPO retirees. Although these retirees retired prior to the formation of Case and sales of its stock to the public, Case has agreed with the UAW to create a VEBA and to fund it with $24,700,000 in order to pay a portion of the cost of benefits above the cost cap limit under the El Paso Plan (plus $300,000 in 1998 to pay for the 1998 Medicare Part "B" overage). An additional 2.8M from the economic settlement will be contributed for total VEBA funding of approximately $27,800,000. The parties recognize that the VEBA is intended to complete Case's funding of the above cap cost and that Case will not be required to make any further contributions to the VEBA from its own funds.

dismissed and then re-filed with only the retirees as plaintiffs. *See Yolton v. El Paso Tenn. Pipeline Co.*, 318 F.Supp.2d 455 (E.D. Mich. 2003). The union did, however, provide litigation support for the retirees.

The central issue in *Yolton* was the legal effect of successive CBA provisions guaranteeing fully-funded health care benefits to retired employees for life, which dated back as far as 1975 and had been reiterated in a series of summary-plan descriptions of benefits that Case provided annually to its employees. The retirees contended that those benefits had vested under the Sixth Circuit's interpretation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.*, and that the failure to provide fully-funded, non-capped, lifetime benefits violated section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. Both the district court and this court agreed. *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578-85 (6th Cir. 2006). Once that issue was resolved in the plaintiff retirees' favor, defendants Case and El Paso were left to dispute between themselves the question of liability for the costs of the health care benefits owed the retirees. Ultimately, we held in *Yolton* that El Paso alone was responsible for maintaining fully-funded health care benefits, including the above-cap costs, based on predecessor Tenneco's assumption of liability under the 1994 reorganization agreement. *Id.* at 592-94.

Despite that victory, CNH America – as Case's successor company – filed this suit against the UAW in February 2009, alleging breach of contract in violation of the LMRA's section 301 and setting out, in addition, three state-law claims growing out of the VEBA agreement: breach of the UAW's implied warranty of authority to release CNH America from any further obligation to pay the pre-IPO retirees' benefits, and the union's intentional misrepresentation and negligent misrepresentation of that authority. Citing the Supreme Court's seminal rulings in *Allis-Chalmers*, 471 U.S. at 220 (holding that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law"), and in *Lingle*, 486 U.S. at 407 (a state law claim "inextricably

intertwined with" an analysis of the terms of a CBA is likewise pre-empted), the district court relied on the two-part test that we developed in *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033 (6th Cir. 1989), to determine whether the state law claims in this case required interpretation of the CBA or the VEBA plan incorporated into the CBA:

> First, the court must determine whether resolution of the claim(s) requires interpretation of the terms of a collective bargaining agreement. [*Terwilliger*, 882 F.2d] at 1037. Second, the court must ask whether the claim(s) is based on rights created by the collective bargaining agreement or under state law. *Id.* If contract interpretation is not required and the right arises from state law, § 301 preemption is not warranted. *Alongi v. Ford Motor Co.*, 386 F.3d 716, 724 (6th Cir. 2004). Stated in the reverse, if contract interpretation is required or the claim is based on rights created by the collective bargaining agreement, the claim is preempted. *Id.* In the present matter, the UAW argues that CNH's state law claims only can be resolved by interpreting the VEBA Agreement and that therefore those claims are preempted.

*CNH America, LLC v. UAW*, 634 F.Supp.2d 851, 860 (E.D. Mich. 2009). The district court held in favor of preemption, concluding that:

> [W]hether the UAW purported to bind the retirees when it entered into the VEBA Agreement with CNH America and whether it had the authority to so act only can be determined by interpreting the agreement. This is because, if the VEBA Agreement is interpreted as a release only of CNH's obligation to contribute additional funds to the VEBA trust and not as a complete release of CNH's liability for the above-cap cost of the retirees' benefits, it is not a contract binding (or purporting to bind) the retirees. The union's power to bind the retirees – or its lack thereof – only becomes relevant if the VEBA Agreement is interpreted as a release of CNH's liability for the retirees' vested health care benefits. The UAW only needed the consent of the retirees to negotiate the VEBA Agreement if the parties to the agreement were attempting to alter the retirees' vested benefits therein. *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20 (1971); *Mesa v. Gen. Battery Corp.*, 908 F.2d 1262, 1271-72 (5th Cir. 1990).

*Id.* Because the need for the retirees' consent existed *only* if CNH America and the UAW were attempting to alter the retirees' vested benefits, the district court correctly held that the implied-warranty-of-authority claim was preempted by section 301 of the LMRA.

In addition, the district court carefully interpreted and applied Wisconsin law with regard to CNH America's claims of intentional and negligent misrepresentation, noting that:

> [U]nder Wisconsin law, [such claims] require proof of these common elements: "(1) the defendant making a factual representation, (2) which was untrue, and (3) which the plaintiff believed to be true and relied on to his or her detriment." *Grube v. Daun*, 496 N.W.2d 106, 114 (Wis. Ct. App. 1992) (citing *Whipp v. Iverson*, 168 N.W.2d 201, 203 (Wis. 1969)). In addition, the factual misrepresentation must be "material." *See Ramsden v. Farm Credit Servs. of North Cent. Wisconsin ACA*, 590 N.W.2d 1, 5 (Wis. Ct. App. 1998).

*Id.* at 860-61.  The district court observed that in its complaint, CNH America's misrepresentation claims were based on the factual allegation that the UAW intentionally or negligently "misrepresented its authority regarding the Pre-Reorganization Retirees by never communicating to CNH America that it lacked authority to bind the Pre-Reorganization Retirees in connection with the VEBA trust and release."  But, the court said, the materiality of the alleged misrepresentation could not be determined without interpreting the VEBA agreement, given that the union's authority to represent the retirees would be material *only* if the VEBA agreement was intended to release CNH America from its liability for the retirees' vested benefits.  If, on the other hand, the VEBA agreement was intended *merely* to release CNH America from making any further contributions to the VEBA trust fund, as the UAW contended (and as the language of the agreement reads), then the UAW's alleged misrepresentation of its authority to bind the retirees during the 1998 negotiations was not material.  Hence, the district court concluded, "an element of CNH America's misrepresentation claims – i.e., the materiality of the UAW's alleged factual [mis]representations – therefore is 'inextricably intertwined with consideration of the terms of the labor contract,'" and those claims are preempted by federal law.  *Id.* at 861 (quoting *Allis-Chalmers*, 471 U.S. at 213).

In reaching that conclusion, the district court addressed the argument, emphasized by the majority here, that the state-law claims were premised on

representations allegedly made by the UAW *prior* to the formation of the VEBA agreement and, thus, could be considered independent of the VEBA agreement itself. But, as the court observed, "a determination of whether those representations were material or false requires interpretation of the labor agreement." *Id.* As a result, "the trier of fact [could] not conclude that the elements of CNH's misrepresentation claims are satisfied simply by finding that the UAW misrepresented that it had the authority to negotiate on behalf of the retirees prior to the formation of the VEBA agreement," because in order to "decide whether that representation was false and material, the trier of fact also must conclude that the parties intended to alter the vested benefits of the retirees and determining the parties' intent requires interpretation of their agreement." *Id.* at 861-62. Thus, the district court held, the Supreme Court's decisions in *Allis-Chalmers* and *Lingle*, as well as the Sixth Circuit cases interpreting those decisions, require federal pre-emption of the plaintiff's state-law claims.

In reaching this determination, the district court did not rely on or even cite to the Supreme Court's opinion in *Textron*. But if, as the majority would have us believe, *Textron* is the dispositive case here, how did the district court miss it? Equally puzzling, why did Justice Scalia, the author of *Textron*, fail to acknowledge that the court was effectively overruling *Allis-Chalmers* and *Lingle*? Upon a close reading of these two sets of cases, the answer becomes obvious – they are wholly distinguishable, because they deal with entirely separate situations and, therefore, require different analyses.

In *Allis-Chalmers*, an employee filed an action in state court seeking to recover for the company's bad faith in handling payments under a disability plan that, as here, was incorporated into a CBA that Allis-Chalmers had negotiated with the UAW. Instead of grieving the company's periodic withholding of disability payments, as required by the CBA, the employee filed a state-law action that the Supreme Court ultimately held pre-empted by federal law:

> [W]hen resolution of a state-law claim is substantially dependent upon the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, *see Avco Corp. v. Aero*

> *Lodge 735*, 390 U.S. 557 (1968), or dismissed as pre-empted by federal
> labor-contract law.

*Allis-Chalmers*, 471 U.S. at 220.

The employee in *Lingle* had submitted what the employer considered a false workers' compensation claim and was discharged on that basis. She then filed a retaliatory-discharge action in an Illinois state court, alleging that she had been wrongfully discharged for exercising her rights under the state workers' compensation statute. After removal to federal court, the company filed a motion to dismiss the case as pre-empted by § 301 of the LMRA, arguing that the retaliatory discharge claim was "inextricably intertwined" with the applicable CBA provision prohibiting discharge without "just" cause. The Supreme Court rejected this argument:

> Illinois courts have recognized the tort of retaliatory discharge for filing a worker's compensation claim, and have held that it is applicable to employees covered by union contracts. "[T]o show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights." Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement. To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge; this purely factual inquiry likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is "independent" of the collective-bargaining agreement in the sense of "independent" that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.

*Lingle*, 486 U.S. at 406-07 (citations omitted). The Supreme Court emphasized that it was following not only the holding in *Allis-Chalmers*, but also its decisions in earlier cases such as *Teamsters v. Lucas Flour Co,*, 369 U.S. 95, __ (1962) (holding that a state-law claim for breach of contract involving the calling of a strike by the union was pre-empted by § 301 because the "possibility that individual contract terms might have

different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements"), and *Electrical Workers v. Hechler*, 481 U.S. 851, 860 (1987) (holding that a state-law claim for breach of duty to provide an employee with a safe workplace was pre-empted by § 301 because "[t]he threshold inquiry for determining if a cause of action exists is an examination of the contract to ascertain what duties were accepted by each of the parties and the scope of those duties").

In contrast, the dispute in *Textron* did not raise a question of section 301 pre-emption,[3] because there were no state claims involved in the suit, which was filed in federal court seeking relief under federal law. Nor did resolution of the dispute require judicial interpretation of the terms of the applicable CBA. Indeed, the relevant terms were clear: the union agreed to a no-strike provision and, perhaps in return, the company agreed to notify the union before subcontracting out work that could otherwise be performed by union employees. After the CBA took effect, Textron subcontracted so extensively that it caused the loss of work for approximately one-half of the union members. The union filed suit in federal court under section 301, alleging that Textron had fraudulently induced the union to sign the CBA by failing to share information during negotiations regarding the company's then-existing plan to subcontract out work, despite repeated requests for such information by the union. The complaint sought damages and a declaratory judgment that the agreement was voidable at the union's option.

In determining that the federal courts did not have subject-matter jurisdiction over the *Textron* dispute, the Supreme Court focused on the text of section 301 and concluded, after some extended and exquisite parsing, that jurisdiction over "suits for violation of contracts between an employer and a labor organization," 29 U.S.C. § 185(a), is limited to actions "filed *because a contract has been violated*" and that the

---

[3]The *Textron* case clearly did not raise a question of pre-emption, despite our later misreading of the opinion in *Along v Ford Motor Co.*, 386 F.3d 716 (6th Cir. 2004) (noting, erroneously, that "the Supreme Court [in *Textron*] made clear that a simple claim of fraudulent inducement to sign a labor contract, without more, is *not* a 'suit for violation of contracts,' and so is not pre-empted by § 301"). *Id.* at 725 (emphasis in original).

statute does not authorize a direct challenge to a CBA's validity by means of a declarative judgment action. *Id.* at 658 (emphasis in original). But, it should be clear from the context of the dispute in *Textron*, as well as the ruling itself, that *no issue of pre-emption was raised* in the case and that *no interpretation of the contract or any of its terms was required* in the resolution of the appeal. It follows that there is no reason to conclude, as the majority apparently does, that *Textron* has had the effect, directly or *sub silentio*, of overruling *Allis-Chalmers*, its controlling precedents, or its progeny. The question of whether a state-law claim stemming from a labor dispute is – or is not – pre-empted by section 301 nowhere appears in the *Textron* majority or concurring opinions. It is nothing short of jurisprudential folly to claim that *Textron* is nevertheless controlling here.

The majority in this case also relies on our opinion in *Alongi v. Ford Motor Co.*, 386 F.3d 716 (6th Cir. 2004), but that decision is of little help to the analysis here. In the first place, *Alongi* misstated the holding of *Textron*, at least in part and, significantly, in the part that is most relevant here, saying that in *Textron*, "the Supreme Court made clear that a simple claim of fraudulent inducement to sign a labor contract, without more, is *not* a 'suit for violation of contracts,' and so is not pre-empted by § 301." *Id.* at 725 (emphasis in the original). Perhaps even more significant is the fact that *none* of the four claims contained in the complaint filed in *Alongi* required a judicial interpretation of, nor made any reference to, the CBA. Instead, the plaintiffs, union members, claimed that the defendant company had bribed a union negotiator, who then deliberately failed to include a provision protecting union members in the event of a plant closing; that the company's negotiator misrepresented the company's financial soundness; and that after the plant closed, the company failed to rehire the workers at another Ford entity, in violation of Michigan criminal law and public policy. Because the state-law claims in *Alongi* did not present a federal question, the case was properly remanded to state court, despite its obvious but ultimately irrelevant mischaracterization of *Textron*.

Finally, it seems to me that the majority opinion, while paying lip-service to *Allis-Chalmers*, fails to respect the policy behind the decision in that case, the cases on

which it relied, and the many decisions that have followed it. The Supreme Court acknowledged that under section 301, federal jurisdiction exists over "suits for violation of contracts between an employer and a labor organization," 471 U.S. at 209, but the Court also said:

> If the policies that animate § 301 are to be given their proper range, however, *the pre-emptive effect of § 301 must extend beyond suits alleging contract violations*. These policies require that "the relationships created by [a collective-bargaining] agreement" be defined by application of "an evolving federal common law grounded in national labor policy." *Bowen v. United States Postal Service*, 459 U.S. 212, 224-225 (1983). The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as [state-law] claims . . . .

*Id.* at 210-11 (emphasis added).

Until the Supreme Court chooses explicitly to extend *Textron* to a dispute raising a question of pre-emption in which resolution of state-law claims requires the application of federal labor law to the agreement that is the subject of the dispute, or explicitly overrules *Allis-Chalmers*, I contend that we must follow *Allis-Chalmers*. In this case, the district court did just that, and the district court got it right. I would therefore affirm the determination that the state claims included in CNH America's complaint are pre-empted by federal law for the very reasons set out in the district court opinion and, likewise, affirm the judgment of dismissal.

For these reasons, I respectfully dissent.