NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0166n.06

Case No. 25-1679

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DENIS MCCORMICK and FARM2DAY, LLC, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| MERLO S.P.A. INDUSTRIA METALMECCANICA and MERLO AMERICA, LLC, | ) ) ) ) | OPINION |
| Defendants-Appellees. | ) ) | |

**FILED**
Apr 14, 2026
KELLY L. STEPHENS, Clerk

Before: MOORE, THAPAR, and MATHIS, Circuit Judges.

THAPAR, Circuit Judge. Denis McCormick sold and distributed farm equipment produced by Merlo, an Italian manufacturer. McCormick initially partnered with an American distributor to sell Merlo equipment in several midwestern states. In 2023, however, Merlo ended its partnership with the distributor and set up its own subsidiary in the United States. Based on his conversations with a Merlo representative, McCormick believed he would work with Merlo's new American subsidiary to continue distributing equipment. But instead of partnering with McCormick, Merlo cut him out of the supply chain altogether.

McCormick sued for tortious interference with a business relationship and violation of a Michigan law protecting farm-equipment dealers. The district court dismissed both claims and

denied McCormick's request to amend. We reverse the dismissal of his tortious-interference claim but affirm the rest.

I.

Merlo S.p.A. Industria Metalmeccanica (Merlo) is an Italian company that manufactures and sells telehandlers. Telehandlers are motorized hydraulic lifts with aerial booms—a cross between a forklift and crane. To reach American buyers, Merlo partnered with multiple layers of middlemen to market, distribute, and ship its products.

Denis McCormick was one such middleman. McCormick operates Farm2Day, LLC (Farm2Day), a Michigan company that he wholly owns and solely runs. Through Farm2Day, McCormick sold Merlo telehandlers to a "dealer network" in Michigan, Wisconsin, Illinois, Indiana, Ohio, and Minnesota. Those dealers, in turn, sold telehandlers directly to buyers in that geographic region.

McCormick didn't deal with Merlo directly—at least, not at first. In 2022, McCormick entered into an Independent Manufacturers Representative Agreement (Representative Agreement) with Applied Machinery Rentals, LLC (AMR).[1] At that point, AMR had served as the sole independent "dealer, distributor[,] and importer" of Merlo products in the United States for over ten years. R. 14, Pg. ID 159; *see also id.* at 199. Under the Representative Agreement, AMR appointed McCormick as its "authorized, exclusive representative to sell and promote" Merlo products in the six states where McCormick had a dealer network. *Id.* at 182. As payment, McCormick received a 12 percent commission on each machine he sold. To maintain his status as an exclusive dealer, AMR required McCormick to sell at least $3.5 million of Merlo telehandlers

---

[1] We refer to this company as Applied Machinery Rentals (AMR) instead of Applied Machinery Sales (AMS), though both names appear in the record.

per year. McCormick met this threshold, selling over $11 million of Merlo telehandlers under the Representative Agreement over two-and-a-half years.

Merlo eventually tried to simplify its supply chain by taking over AMR's distribution network. As part of this transition, McCormick began working directly with a Merlo representative named Francesco Brondino. McCormick alleges that during a series of calls, "Brondino informed [him] that Merlo had taken over the distribution network of AMR and that Merlo Italy would be honoring the terms of the Representative Agreement." *Id*. at 178. Based on this assurance, McCormick believed he'd be working directly with Merlo and assumed Merlo was AMR's successor in interest.

At first, not much appeared to change for McCormick. Merlo listed Farm2Day as a "dealer" on its website. *Id*. at 178, 187. It opened an account on its internal portal so that Farm2Day could order parts, and it required McCormick to attend a training session on Merlo's online ordering system. Merlo directed McCormick to continue contacting dealers, assisting with sales, completing pending orders, attending tradeshows, and promoting Merlo's products. And, at Merlo's request, McCormick emailed Merlo representatives any "invoices and quotes" that Farm2Day received from AMR. *Id.* at 162; *see also id.* at 189. McCormick also shared information on pending orders, including approximately 15 outstanding sales that Merlo needed to fulfill.

AMR and Merlo's handoff accelerated in the summer. In late June, Merlo established Merlo America, LLC (Merlo America) to conduct its future operations in the United States. Six days later, it terminated its decade-long exclusive distributorship agreement with AMR. A week after that, it announced those changes to its American partners and dealers, including McCormick. Finally, in mid-July, AMR petitioned for Chapter 7 bankruptcy to liquidate its assets. *See In re*

*Applied Mach. Rentals, LLC*, No. 23-30461, 2026 WL 192608, at *2 (Bankr. W.D.N.C. Jan. 23, 2026). Throughout this transition, Brondino spoke "extensively" with McCormick to keep him apprised of any changes. R. 14, Pg. ID 201.

To address any gaps during this transition period, Merlo implemented a "temporary emergency plan for the direct supply of spare parts." *Id.* at 198. On July 27, Brondino emailed McCormick to confirm a two-step procedure for Farm2Day to make "spot sales" of Merlo equipment. For each sale, Merlo would "present" McCormick with "an offer, to be signed for acknowledgement and acceptance," which would include the equipment's configuration, availability, and price. *Id.* at 201. To participate in the spot sales program, "[t]ogether with the offer," McCormick would have to sign a "General Terms of Sale" (GTS) agreement. *Id.* at 201, 204. Brondino also informed McCormick that any current equipment orders would be delayed to allow Merlo to route sales and invoices through Merlo America. Brondino concluded by telling McCormick that he would negotiate "favourable payment terms" for Farm2Day, including an internal credit line. *Id.*

McCormick believed that he "accepted the terms" of that July email. *Id.* at 163. As requested, he signed and returned Merlo's GTS two days later. McCormick viewed the GTS as a formal—but "pretty vague"—contract that solidified his role developing relationships with dealers. R. 22, Pg. ID 454. He understood Brondino's email to encourage Farm2Day to buy telehandlers directly from Merlo and sell them anywhere in the United States. In short, he assumed he should continue securing orders for Merlo telehandlers in exchange for some type of compensation.

As is customary for Italian businesses, Merlo's employees went on vacation for most of August. During that time, McCormick's communication with Merlo decreased. But, while

waiting for Merlo's Italian factory to resume operations, McCormick continued attending tradeshows and securing orders from his dealer network.

Merlo reopened with a change of heart. In late August, Brondino told McCormick that Merlo planned to work directly with American dealers instead of selling machines through Farm2Day's dealer network. Brondino stated that "there is no such thing as 'your' dealers, and we are absolutely and completely free to contact directly all dealers of the former AM[R] Network." R. 14, Pg. ID 214. Brondino clarified that Farm2Day's Representative Agreement "was between you and AM[R] . . . and Merlo had nothing to do with it and hence has no obligations, of any kind, in reference to it." *Id.* In response, McCormick asked Merlo how he should "handle" the purchase orders he'd already signed for approximately 15 units worth $1.5 million. *Id.*

Brondino and McCormick continued discussing the pending orders over the next month. In September, Brondino directed McCormick to "disregard [his] email dated July 27th, related to potential direct sales to Farm2Day, and consider it null and void." *Id*. at 218. Brondino explained that he had sent the email when Merlo had little information about its American dealers and no way of verifying whether McCormick's statements and requests were accurate. Now, Merlo would be taking over all communications with American dealers, including providing them quotes directly. Brondino suggested that Farm2Day could still assist with sales leads and product support and continue attending tradeshows and sourcing local attachments. But Merlo wouldn't be involved in that activity.

In November, McCormick's attorney sent Merlo a letter demanding that Merlo repurchase parts and attachments in Farm2Day's inventory. At that time, McCormick claimed that he "had a bucket and some parts" made by Merlo valued at $4,476.52. *Id*. at 165, 171. He also had the

unfulfilled purchase orders for Merlo products from his dealer network. Merlo subsequently fulfilled those 15 orders without involving Farm2Day or paying McCormick a commission. Merlo also refused to repurchase the bucket and spare parts.

McCormick sued Merlo for violations of the Michigan Farm and Utility Equipment Act and for tortious interference with a business relationship. *See* Mich. Comp. Laws § 445.1451, *et seq*. Merlo moved to dismiss, and the district court dismissed both claims. It found that Farm2Day didn't qualify as a "dealer" and the emails between Merlo and McCormick didn't constitute an "agreement" under the Act. R. 23, Pg. ID 492–96. It then rejected McCormick's tort claim because he couldn't show Merlo's conduct was "illegal, unethical, or fraudulent" or breached a business "relationship or expectancy." *Id*. at 498–99. Because McCormick had already amended his complaint once, the district court dismissed with prejudice. McCormick timely appealed.

II.

To survive a motion to dismiss, a complaint must plead enough facts for the court to reasonably conclude that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a motion to dismiss, we accept all well-pleaded factual allegations in the complaint as true and draw any inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). We review a district court's grant of a motion to dismiss de novo. *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 678 (6th Cir. 2017).

McCormick's complaint didn't allege enough facts to show an agreement between him and Merlo, so the district court properly dismissed his statutory claim. But the district court should have allowed his tortious-interference claim to proceed because McCormick plausibly alleged that Merlo engaged in fraudulent or unethical behavior that harmed a business relationship.

A.

Start with McCormick's statutory claim. The Michigan Farm Utilities and Equipment Act regulates contracts between manufacturers and dealers of farm equipment in light of the dealers' relatively small bargaining power. *See Weingartz Supply Co. v. Salsco Inc.*, 871 N.W.2d 375, 379–80 (Mich. Ct. App. 2015). It gives those dealers certain rights and remedies against suppliers. *Id.* at 380. For instance, the Act guarantees that if a supplier terminates or modifies an agreement without fair notice and good cause, the supplier must pay any damages to the dealer and repurchase any of the supplier's products in the dealer's inventory. Mich. Comp. Laws §§ 445.1453, 445.1457a(1), (3).

Here, McCormick tried to require Merlo to repurchase his inventory and compensate him for damages. To state a claim under the Act, McCormick's complaint must plausibly allege that (1) Merlo is a "supplier," and McCormick is a "dealer," (2) McCormick had an "agreement" that Merlo "terminated," and (3) McCormick correctly invoked the Act's repurchase and compensation procedures. *Id.* § 445.1453. McCormick hasn't plausibly alleged that he and Merlo had an "agreement," so his claim fails at that step.

***Supplier & Dealer.*** As the parties and district court agree, Merlo, Merlo America, and AMR qualify as "suppliers" under the Act. The Act defines a "supplier" as "a manufacturer, wholesaler, or distributor of farm and utility tractors and farm and utility equipment, or the attachments to or repair parts for that equipment." *Id.* § 445.1452(i). Telehandlers—as well as spare parts or attachments for telehandlers—are qualifying "equipment." *Id.* § 445.1452(d). So Merlo is a "manufacturer" of covered equipment, while Merlo America is a "distributor" of the same. Until its bankruptcy, AMR was also a supplier because, like Merlo America, it distributed farm equipment directly to dealers.

The "dealer" label is harder. The Act defines a "dealer" as a person or proprietorship "engaged in the business of the retail sale" of farm equipment, attachments, and parts. *Id.* § 445.1452(c); *see also id.* § 445.1452(h) (defining "person" to include businesses). Dealers "include[] retail dealers, wholesalers, and distributors that obtain inventory from another person for resale." *Id.* § 445.1452(c). "Inventory," in turn, refers to "farm tractors, utility tractors, equipment*,* and accessories for attachments to and repair parts for those tractors and that equipment." *Id.* § 445.1452(f).

The complaint plausibly alleges that McCormick sold and distributed Merlo's inventory as a dealer. First and foremost, McCormick "obtain[ed] inventory"—a bucket and some repair parts and attachments for Merlo products—"from [AMR] for resale." *Id.* § 445.1452(c). Aside from that, Merlo's conduct supports the reasonable inference that McCormick was a dealer. Merlo required McCormick to complete required trainings for "dealers," gave him access to its internal platform for dealers, and listed Farm2Day as a "dealer" on its website. R. 14, Pg. ID 162. Merlo additionally permitted McCormick to attend tradeshows and negotiate with buyers as a verified "dealer" of Merlo equipment. *Id.* And Merlo referred to McCormick as a "dealership" and "US dealer" in email correspondence. *Id.* at 189.

McCormick didn't need to maintain Merlo telehandlers on his premises to qualify as a dealer. The Act explicitly includes entities selling "repair parts" and "accessories" for equipment in its definition of a "dealer." Mich. Comp. Laws § 445.1452(c), (f). So "[t]he maintenance of [a] parts inventory, alone, confers [a company] with dealer status." *See Cloverdale Equip. Co. v. Manitowoc Eng'g Co.*, 964 F. Supp. 1152, 1160 (E.D. Mich. 1997), *aff'd*, 149 F.3d 1182 (6th Cir. 1998) (unpublished table decision). McCormick asserts that it sells parts produced by Merlo—

including the itemized inventory worth $4,476.52—to other entities to repair Merlo equipment. At the motion-to-dismiss stage, this allegation alone qualifies McCormick as a dealer.

Notably, McCormick didn't have to buy the spare parts directly from Merlo to qualify as a dealer. The Act states that a dealer may purchase inventory "from another person [or business entity] for resale." Mich. Comp. Laws § 445.1452(c). So the fact that McCormick dealt with AMR (the distributor) instead of Merlo (the manufacturer) doesn't determine McCormick's status as a dealer. Put otherwise, an entity's status as a dealer depends on its downstream relationships, not its upstream ones.

*Agreement*. To invoke the Act's remedies for breach, a dealer must first identify an "agreement" with a supplier. *Id.* §§ 445.1453, 445.1457a(1), (3). An "agreement" refers to any "written, oral, or implied contract [or] sales agreement . . . between a supplier and a dealer." *Id.* § 445.1452(e). The agreement must "authorize[]" the dealer to sell or distribute "equipment as an authorized outlet of the supplier or in accordance with methods and procedures provided for or prescribed by the supplier." *Id.*

McCormick points to several possible "agreements" with Merlo. None qualifies.

*First*, McCormick asserts that Merlo formed an "agreement" with him when it became AMR's successor in interest. The Act specifies that a successor in interest might include an entity that "acquires more than 25% of the assets, stock, good will, or trade name of a supplier" or an assignee, trustee, or company resulting from a merger or liquidation of a supplier. *Id.* § 445.1452(i). McCormick alleges that an AMR representative told him that Merlo would be "buying out" AMR. R. 14, Pg. ID 161, 166. He similarly claims that Brondino confirmed Merlo had "taken over" AMR's network and communications. *Id.* at 167, 218; *see also id.* at 170. From

these statements, McCormick argues that Merlo assumed AMR's contractual responsibilities, either through assignment or by becoming AMR's successor in interest.

For starters, that's not how contractual assignment works. A non-party to a contract may step into the shoes of a party only if two requirements are met. First, the current party must clearly intend to assign its obligations to the non-party. *Burkhardt v. Bailey*, 680 N.W.2d 453, 463 (Mich. Ct. App. 2004). Second, the non-party must clearly intend to assume the current party's obligations. *Bandit Indus., Inc. v. Hobbs Int'l, Inc.*, 620 N.W.2d 531, 535–36 (Mich. 2001). In other words, the assignor and assignee must both manifest an intent to transfer an obligation.

McCormick doesn't plausibly plead that assignment occurred. At minimum, the complaint makes no effort to allege that AMR intended to assign its contract to Merlo. *See Burkhardt*, 680 N.W.2d at 463 (requiring assignor to "clearly manifest a present transfer"). But even if it did, the complaint doesn't plausibly plead that Merlo intended to assume AMR's responsibilities. *See Bandit Indus.*, 620 N.W.2d at 535–36. McCormick's recitation of Brondino's vague verbal statement that Merlo would "honor" AMR's agreement doesn't cut it. R. 14, Pg. ID 170. Michigan's statute of frauds requires promises concerning debts and obligations to be memorialized in writing—not a secondhand verbal account. Mich. Comp. Laws § 566.132(1). And even if Brondino's emails sufficed for written assignment, Brondino didn't confirm that Merlo intended to take on the responsibilities in AMR's contract. Just the opposite. Brondino's emails suggest that Merlo intended to implement an entirely different method of "spot sales" that lacked a clear commission structure or exclusive territory arrangement. R. 14, Pg. ID 168. McCormick's subjective belief that he would continue to operate under his old agreement doesn't constitute the explicit, written manifestation of intent required for contractual assignment.

McCormick can't get around this by insisting Merlo became AMR's successor in interest. For now, we take McCormick's word that an AMR representative told him, "Merlo was buying out AMR," and that Brondino stated that Merlo had "taken over" AMR's distribution network. R. 14, Pg. ID 161, 178. But neither of those isolated statements pleads that Merlo acquired enough of AMR's stock and goodwill to meet the Act's successor-in-interest threshold. For starters, at AMR's bankruptcy sale, Merlo ultimately purchased $200,000 of small parts—well under the 25 percent successor-in-interest threshold—and explicitly refused to assume any of its liabilities. Order Approving Motion to Sell Free and Clear of Any Interests in Property at 1–4, *In re Applied Mach. Rentals, LLC*, No. 23-30461 (Bankr. W.D.N.C. Jan. 10, 2024), Dkt. No. 306; Trustee's Semi-Annual Report at 3, *In re Applied Mach. Rentals, LLC*, No. 23-30461 (Bankr. W.D.N.C. Jan. 31, 2024), Dkt. No. 339.[2] Despite McCormick's perception that the acquisition was a total buyout, the objective facts from AMR's bankruptcy proceedings contradict his narrative.

Nor did Merlo acquire AMR's goodwill or trade name. To acquire goodwill, a buyer must assume the "expectancy of continued patronage" by effectively replacing a "well-known and well-conducted business." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993) (quotations omitted); *Colton v. Duvall*, 237 N.W. 48, 49 (Mich. 1931). In other words, the buyer must "step into the shoes of the seller" in the eyes of its customers, suppliers, and business contacts. *Patterson v. Comm'r*, 810 F.2d 562, 569 (6th Cir. 1987) (quotation omitted). Merlo didn't do that. Far from stepping into AMR's shoes, Merlo announced to its dealers that it had terminated its business relationship with AMR. Merlo didn't acquire AMR's trade information, including

---

[2] Though AMR's bankruptcy proceedings aren't described in McCormick's complaint, "[f]ederal courts may take judicial notice of proceedings in other courts of record." *Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) (quotation omitted). We have elsewhere approved taking judicial notice of bankruptcy proceedings when reviewing the grant of a motion to dismiss where the documents noticed "prove[d] facts whose accuracy cannot reasonably be questioned." *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) (quotation omitted). Both McCormick and Merlo rely on these bankruptcy filings on appeal, so their accuracy is not in doubt.

pricing lists, past invoices, or customer information. After all, McCormick's entire theory of the case is that Brondino had to request that information from McCormick. As Brondino explained, Merlo America operated during the summer with "way more limited commercial information" and without the "possibility . . . to verify" AMR's customers, pricing, or past sales. R. 14, Pg. ID 218. So instead of acquiring AMR's name and goodwill, Merlo America acted like a new market entrant: It set up shop, announced its prices and products, and started hunting for customers.

*Second*, McCormick asserts that Brondino's email from July 27, 2023, outlining a "spot sales" method constituted an agreement. In the alternative, he argues that Brondino's email modified McCormick's existing agreement with AMR. But the July email described steps McCormick could take to enter a future contractual relationship with Merlo. As a result, it didn't independently create an agreement, much less modify the existing Representative Agreement between McCormick and AMR.

The July email outlined two steps for McCormick to begin selling Merlo equipment. First, the email requested that McCormick sign Merlo's General Terms of Sale (GTS). McCormick returned the signed GTS two days later. True to its name, the GTS provided *general* information about Merlo's business practices and expectations for its customers. But, as McCormick himself observed, the GTS was so "vague" that he would need "a new contract drawn up" to continue working with Merlo. *Id.*; R. 22, Pg. ID 454. That new contract would need to "specify[] what [his] territory will be, and how [he would] be getting paid," and "state what [Merlo] expect[ed] from [McCormick]." R. 22, Pg. ID 454. The GTS articulated the broad outlines of a prospective supplier-dealer relationship, not a standalone contract for future sales.

The July email explained that, "[t]ogether with" the "vague" GTS, McCormick would need to secure an individual agreement for each sale. *Id.*; R. 14, Pg. ID 201. Merlo would "present

[McCormick] an offer, to be signed for acknowledgement and acceptance, for certain models." R. 14, Pg. ID 201. That offer would include the model's availability, configuration, price, and shipping terms. Without that "spot" contract, McCormick couldn't have sold Merlo's machinery because he didn't know the specifics of Merlo's available equipment. Indeed, before securing any purchase orders, he followed up to request "a complete breakdown of pricing including pricing on options and also availability." *Id.* at 215. And McCormick never received a single spot sale contract from Merlo. All told, Brondino's July email outlined steps McCormick needed to take to enter an agreement—but it wasn't an agreement on its own.

For similar reasons, the July email and the GTS didn't modify McCormick's contract with AMR. Nonparties to a contract can't alter that contract, in part because they aren't bound by it. *AFSCME Council 25 v. Wayne County*, 811 N.W.2d 4, 11 (Mich. Ct. App. 2011) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)). The only parties to the Representative Agreement were McCormick and AMR—not Merlo, Merlo America, or even Farm2Day. So the GTS and spot sales arrangement between Merlo and Farm2Day couldn't change the separate contract between McCormick and AMR.

*Third*, McCormick asserts that Merlo's conduct created an implied contract or sales agreement under the Act. Courts will recognize an implied contract "where parties assume obligations by their conduct." *Williams v. Unit Handling Sys. Div. of Litton Sys., Inc.*, 449 N.W.2d 669, 670 (Mich. 1989*)*; *Erickson v. Goodell Oil Co.*, 180 N.W.2d 798, 800 (Mich. 1970) ("A contract implied in fact arises under circumstances which, according to the ordinary course of dealing . . . , show a mutual intention to contract."). To support this theory, McCormick points to Merlo's decisions to register Farm2Day on its website and encourage McCormick to continue completing sales and promoting Merlo's products. He also emphasizes Brondino's statements that

Merlo would "honor[]" AMR's contract and that it had "taken over" AMR's dealer network. R. 14, Pg. ID 178. According to McCormick, Merlo's conduct demonstrated a clear intent to renew or assume the obligations from McCormick's contract with AMR.

McCormick's complaint doesn't plead an "implied contract" under the Act. Mich. Comp. Laws § 445.1452(e). McCormick provides ample allegations that *he* believed he had entered an agreement with Merlo. But McCormick's "unilateral subjective intent" can't control the terms of a contract. *Burkhardt*, 680 N.W.2d at 464. And McCormick doesn't give sufficient facts for us to infer Merlo shared his belief. At best, McCormick alleges Merlo's representative reassured him that the parties could find opportunities to work together in the future, potentially on similar terms to the AMR contract. Yet the vague intent to do business on uncertain terms at a later date doesn't constitute the "meeting of the minds" necessary for contract formation. *Id.* at 463. And absent such a mutual shared understanding, McCormick can't show there's an implied contract.

At oral argument, McCormick seemed to offer yet another theory: Brondino's promises and Merlo's conduct formed an implied oral sales agreement. As McCormick explains, the Act recognizes "written, oral, or implied . . . sales agreement[s]" governed by the supplier's "methods and procedures." Mich. Comp. Laws § 445.1452(e). According to McCormick, Brondino's promise to "honor" the AMR contract, coupled with Merlo's decisions to list Farm2Day as a dealer and request information on pending orders, formed an agreement both "by conduct and by words and representations." Oral Arg. at 02:30–02:35. And Merlo's "methods and procedures" governed that agreement once McCormick completed his training and signed the GTS. To advance this theory, McCormick argues that the term "agreement" in the Act must be broader than the term "contract." Mich. Comp. Laws § 445.1452(e). Otherwise, the clause defining "agreement" as a "written, oral, or implied contract, sales agreement, security agreement, or franchise agreement"

would be redundant. *Id.* So if Brondino's promises fell short of a "contract," perhaps they might still form an implied "sales agreement."

This alternative argument also fails. For starters, we typically don't consider theories raised for the first time at oral argument. *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009). But even if McCormick had preserved this theory, Brondino's statements don't clear the lower threshold of mutuality that McCormick suggests is required for an implied oral sales agreement. Brondino's vague promise to "honor" McCormick's AMR contract doesn't allow us to infer that Merlo intended to enter a sales agreement under the same terms.

***Damages***. Even if Merlo terminated a qualifying agreement, McCormick doesn't plausibly plead that he's entitled to damages under the Act.

To alter or terminate an "agreement," the Act requires a supplier to provide the dealer with a "written notice" explaining the reasons for the change at least 90 days in advance. Mich. Comp. Laws § 445.1457a(1). If a supplier doesn't do so, the dealer may require the supplier to (1) pay "damages caused . . . by the supplier's breach," and (2) "repurchase any inventory of the dealer." *Id*. §§ 445.1457a(3), 445.1453. Crucially, suppliers don't need to repurchase "[a]ny inventory that was acquired by the dealer from any source other than the supplier." *Id*. § 445.1456(i).

McCormick isn't entitled to either remedy. First, to properly plead damages, McCormick must plausibly identify an amount of loss from the alleged breach. Since he identifies so many possible agreements with conflicting terms, he never does so. That omission is fatal to his claim for compensation. Second, to request repurchase, McCormick must identify inventory that he bought directly from Merlo. But he concedes that the $4,476.52 of spare parts were made by Merlo, then "sold to AMR[] and subsequently sold to Farm2Day." R. 14, Pg. ID 165, 171. Merlo isn't on the hook for spare parts McCormick bought elsewhere.

In sum, McCormick properly pled that he is a "dealer" and Merlo is a "supplier." But even construing the complaint in McCormick's favor, McCormick failed to allege that Merlo "terminated" an "agreement" with him or Farm2Day. So the district court properly dismissed his statutory claim.

B.

McCormick also alleges that Merlo engaged in tortious interference with a business relationship. To prevail, McCormick must show that (1) he had "a valid business relationship or expectancy," (2) Merlo knew of that relationship or expectancy, (3) Merlo intentionally interfered with that relationship or expectancy, and (4) McCormick suffered damages. *Cedroni Assocs., Inc. v. Tomblinson, Harburn Assocs., Architects & Planners Inc.*, 821 N.W.2d 1, 3 (Mich. 2012) (quotation omitted).

Three prongs are easy—at least on a motion to dismiss. McCormick alleges that he cultivated a consistent business relationship with at least eight dealers in his geographic territory. Merlo was undoubtedly aware of these relationships once it received McCormick's invoices and customer information. By August, McCormick had secured 15 purchase orders worth an estimated $1.5 million from these dealers. When Merlo filled these orders directly, McCormick lost value he expected to earn from his dealer network, both on the pending orders and on future orders he might fulfill with Merlo or its competitors. So McCormick has plausibly alleged quantifiable damages from the termination of expected business known to Merlo.

The hardest prong is the third one: Did Merlo induce the termination of these purchases by engaging in "intentional interference"? To be "intentional," the defendant's conduct must be directed at the plaintiff's relationships, rather than merely incidental to the defendant's own competitive activities. *Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. Ct. App. 1984). And

"interference" requires the plaintiff to show the defendant intentionally engaged in actions that were "illegal, unethical[,] or fraudulent." *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010); *Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 453 (Mich. Ct. App. 2018). But actions "motivated by legitimate business reasons" don't fall into these categories. *BPS Clinical Lab'ys v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) (per curiam) (citations omitted).

So was Merlo's conduct fraudulent or unethical? To establish fraud, a plaintiff must show (1) the defendant knowingly or recklessly made a false and material misrepresentation to induce action, and (2) the plaintiff was injured after acting in reliance on the defendant's statement. *Roberts v. Saffell*, 760 N.W.2d 715, 719 (Mich. Ct. App. 2008), *aff'd mem.*, 766 N.W.2d 288 (Mich. 2009). Such misrepresentations may take the form of "a promise made in bad faith, without the intention of performance." *Foreman v. Foreman*, 701 N.W.2d 167, 177 (Mich. Ct. App. 2005) (per curiam) (cleaned up); *Crowley v. Langdon*, 86 N.W. 391, 394 (Mich. 1901) (finding fraud based on the "insincerity of [a] promise"). By the same token, specific acts taken to "pressure" and "destroy" the plaintiff's business relationships may be considered malicious and unethical. *Amphion, Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d 943, 949 (E.D. Mich. 2003). Either fraudulent or unethical conduct would suffice to show interference giving rise to a tort.

At the motion-to-dismiss phase, McCormick plausibly alleged that Merlo engaged in fraudulent or unethical conduct during their negotiations. At the outset, we accept as true McCormick's assertion that Merlo's representatives promised to honor the Representative Agreement with AMR. As support, McCormick observes that Merlo listed McCormick as a "dealer" on its website, trained him to fulfill orders for Merlo products, and authorized him to make "spot sales." R. 14, Pg. ID 162–63. McCormick then appends emails from Merlo that

disavow the existence of McCormick's dealer network and declare "null and void" any agreements between them. *Id.* at 218. In those emails, Merlo stated that it had always been free to contact McCormick's dealers directly and announced that it would be doing so in the future. From these allegations, we can reasonably infer that Merlo (1) represented to McCormick that it intended to maintain a dealer relationship with McCormick, and (2) that representation may have been false or made without the intention of performance.

At that point, we then take as true McCormick's claim that Merlo's representations induced McCormick to share information on Farm2Day's invoices and pending orders. Merlo's assurances that it would honor the Representative Agreement led McCormick to believe that Farm2Day would continue to sell Merlo equipment to its dealer network. We can reasonably infer that if McCormick had known he was dealing with a soon-to-be competitor instead of a supplier, he wouldn't have shared his pricing list, pending orders, and customer information. Merlo used this information to fulfill McCormick's orders, cutting Farm2Day out of the equation. So McCormick incurred injury after acting in reliance on Merlo's representations.

To reach the opposite conclusion, Merlo first urges us to prejudge the credibility and sincerity of its representations to McCormick. Merlo argues that its conduct supports only that it "assessed [its] options in the market before ultimately deciding not to use Plaintiffs as a middleman." R. 20, Pg. ID 262. The district court credited that theory, noting that Farm2Day and McCormick may have felt "strung along" but weren't defrauded by Merlo's business choices.[3] R. 23, Pg. ID 498. At this phase in the proceeding, McCormick needed to plausibly allege that he

---

[3] The district court suggested that it viewed McCormick's tort claim as a contract claim in disguise. R. 23, Pg. ID 498 ("Plaintiffs cannot bring a tort claim seeking to remedy the violation of a contractual duty."). But McCormick properly alleged the elements of tortious interference with a business relationship or expectancy without pointing to breach of a valid contract. *Winiemko v. Valenti*, 513 N.W.2d 181, 184 (Mich. Ct. App. 1994) ("[T]he existence of a valid business relation [is] not necessarily evidenced by an enforceable contract." (quotation omitted)).

shared confidential information only because Merlo credibly represented that it would continue to partner with him. *See Roberts*, 760 N.W.2d at 719. That's exactly what he does. If McCormick was indeed "strung along" by Merlo's efforts to "assess[]" its market options, that false reliance can plausibly support fraudulent misrepresentation in the context of McCormick's tortious-interference claim. R. 23, Pg. ID 498.

Second, Merlo argues that McCormick failed to show that his dealer network had expected value. Appellee's Br. at 50 (quoting R. 23, Pg. ID 499 ("Plaintiffs have alleged no benefit they expected to receive from their dealer network.")). But McCormick's complaint includes ample detail about the value of his dealer network. Among other quantifications, he alleges that his efforts to market, distribute, and repair telehandlers with AMR increased purchases from "a few hundred thousand dollars a year" to more than $11 million over the course of the Representative Agreement. R. 14, Pg. ID 160–61. By August 2023, he specifically alleged that he entered into 15 purchase orders worth $1.5 million with eight named dealers. He also asserts that he repaired parts and supplied attachments for his dealers, in addition to marketing new products to those individuals at tradeshows and associated events. Even without the agreement with AMR, McCormick has plausibly alleged that his dealer network is capable of producing value for Farm2Day. And, at the motion-to-dismiss phase, McCormick's word goes on the facts.

McCormick has plausibly alleged that Merlo induced McCormick to share its customer lists by making representations that it never intended to honor. And McCormick has also alleged that Merlo then used this information to fulfill McCormick's orders without compensating him for his efforts. So, at least for now, this case must proceed.

III.

Finally, McCormick argues that the district court improperly dismissed his complaint with prejudice, preventing him from starting over with an amended complaint. We disagree.

The Federal Rules of Civil Procedure instruct courts to "freely give leave [to amend pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). This standard is a liberal one—but not so liberal as to be a default rule permitting amendments. We review the district court's decision to dismiss without providing an opportunity to amend for abuse of discretion. *Sinay v. Lamson & Sessions Co*., 948 F.2d 1037, 1041–42 (6th Cir. 1991).

Typically, district courts dismiss complaints for failing to state a claim without prejudice to allow the parties to supplement deficient pleadings. *CNH Am. LLC v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 645 F.3d 785, 795 (6th Cir. 2011). But it's not the district court's job to "initiate amendments." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 438 (6th Cir. 2008). So if a party doesn't move to amend before the district court dismisses a complaint, the district court doesn't abuse its discretion by dismissing with prejudice. *See Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 624 (6th Cir. 2021).

That's what happened here. McCormick requested the chance to add evidence about Brondino's email correspondence only after the district court identified gaps in his pleadings while dismissing his claims. But McCormick had ample opportunity to introduce this material before the district court ruled: He could have appended the email chain to his initial complaint in state court or federal court, to his first amended complaint, or moved to amend after his responses to Merlo's two motions to dismiss. But he didn't. So the district court didn't abuse its discretion by denying McCormick yet another bite at the apple.

In the alternative, McCormick asserts that the district court unfairly denied him the opportunity to "supplement the record" at an oral hearing. Appellant's Br. at 23. But the district court's decision to grant oral argument is discretionary. *See* Fed. R. Civ. P. 78. And, though McCormick may have clarified facts alleged in his complaint at an oral hearing, he couldn't have used a hearing to add new facts to save his deficient pleadings. *See* Fed. R. Civ. P. 8(a). Because the district court viewed the complaint as facially implausible, it didn't abuse its discretion by resolving the case based on the parties' written submissions.

\* \* \*

We affirm the dismissal of McCormick's statutory claim, reverse the dismissal of his tortious-interference claim, and remand for further proceedings.